**WHATLEY KALLAS, LLP**
Edith M. Kallas (To Apply *Pro Hac Vice*)
ekallas@whatleykallas.com
1180 Avenue of the Americas, 20th Fl.
New York, NY 10036
Tel: (212) 447-7060
Fax: (800) 922-4851

Alan M. Mansfield (Of Counsel, SBN: 125998)
amansfield@whatleykallas.com
16870 W. Bernardo Dr., Ste. 400
San Diego, CA 92127
Tel: (858) 674-6641
Fax: (855) 274-1888

**CONSUMER WATCHDOG**
Jerry Flanagan (SBN: 271272)
jerry@consumerwatchdog.org
Benjamin Powell (SBN: 311624)
ben@consumerwatchdog.org
2701 Ocean Park Blvd., Suite 112
Santa Monica, CA 90405
Tel: (310) 392-0522
Fax: (310) 392-8874

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN DOE ONE, JOHN DOE TWO, JOHN DOE THREE, and JOHN DOE FOUR, on behalf of themselves and all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**CVS HEALTH CORPORATION; CVS PHARMACY, INC.; CAREMARK RX, L.L.C.; CAREMARK, L.L.C.; CAREMARK CALIFORNIA SPECIALTY PHARMACY, L.L.C.; NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK; and DOES 1-10, inclusive,**<br><br>Defendants. | **Case No.: 2:18-cv-01280**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1)  Violation of Anti-Discrimination Provisions of Affordable Care Act, 42 U.S.C. § 18116;**<br><br>**(2)  Claim for Benefits Due Under the Plans Governed by ERISA, 29 U.S.C. § 1132(a)(1)(B);**<br><br>**(3)  Claim for Breach of Fiduciary Duties Under ERISA, 29 U.S.C. § 1132(a)(2);**<br><br>**(4)  Claim for Failure to Provide Full and Fair Review Required by ERISA, 29 U.S.C. § 1132(a)(3);**<br><br>**(5)  Violation of Americans with Disabilities Act, § 42 U.S.C. § 12101, *et seq.*;**<br><br>**(6)  Violation of California Business & Professions Code § 17200, *et seq.*;** |

1

**(7)    Violation of Unruh Civil Rights Act, California Civil Code § 51,** *et seq.***; and**

**(8)    Declaratory Relief**

**<u>Jury Trial Demanded On All Claims So Triable</u>**

Plaintiffs, by and through the undersigned attorneys, bring this action on behalf of themselves and all others similarly situated against Defendants CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, L.L.C., Caremark, L.L.C., Caremark California Specialty Pharmacy, L.L.C., (hereafter collectively "CVS Caremark Defendants" or "CVS Caremark"), National Railroad Passenger Corporation (d/b/a "AMTRAK"), and DOES 1-10, inclusive (hereafter collectively "Defendants").[1] Plaintiffs allege the following on information and belief, which allegations are likely to have evidentiary support after a reasonable opportunity for investigation and discovery, except as to those allegations that pertain to the named Plaintiffs, which are alleged on personal knowledge:

<u>**NATURE OF THE ACTION**</u>

1.    Plaintiffs anonymously[2] bring this action to challenge Defendants' discriminatory business practices targeting those persons whose prescription drug benefit is administered by CVS Caremark and who are prescribed specialty medications for the treatment or prevention of HIV/AIDS ("HIV/AIDS Medications"). Many enrollees in health plans where CVS Caremark controls and administers the pharmacy benefits are told they are required to obtain their HIV/AIDS Medications from Caremark Specialty Pharmacy d/b/a CVS/Specialty and/or Caremark California Specialty Pharmacy. L.L.C. ("CSP"), a wholly-owned subsidiary of CVS

---

[1]    Plaintiffs bring this action with regard to health care plans (hereinafter "health care plans" or "plans") where the prescription drug benefit of the plan is administered by CVS Caremark. Health care plans include Employee Welfare Benefit Plans as that term is defined in 29 U.S.C. § 1002(1)(A). As used herein, "subscriber" or "enrollee" refers to an individual enrolled in a health care plan that is administered, in part, by CVS Caremark.

[2]    Due to the sensitive nature of this action, Plaintiffs have chosen to file under fictitious names. (*See, e.g., Doe v. Kaweah Delta Hosp.*, 2010 U.S. Dist. LEXIS 135808 (E.D. Cal., Dec. 22, 2010) [AIDS/HIV patient permitted to proceed anonymously]; *Does I thru XXIII v. Advanced Textile Corp*. 214 F.3d 1058, 1068 (9th Cir. 2000) [holding that one of the grounds for proceeding anonymously was that anonymity was necessary "to preserve privacy in a matter of sensitive and highly personal nature"].) Also Plaintiffs cannot publicly reveal by whom they are employed for fear of retaliation and recrimination, but would agree to enter into an appropriate Non-Disclosure Agreement at the appropriate time.

CLASS ACTION COMPLAINT

Health Corporation. CSP only delivers such medications by mail order or mails them to a CVS Pharmacy as a drop shipment location purely for pickup. This program threatens HIV/AIDS patients' health and privacy. If HIV/AIDS patients in those plans do not obtain their HIV/AIDS Medications from CSP, then they must either pay more out-of-pocket or pay full-price with no insurance benefits whatsoever—thousands of dollars or more each month—to purchase their medications at an in-network community pharmacy where they can receive counseling from a pharmacist and other services they may need to stay alive (hereafter, the "Program"). CVS Caremark has effectively denied and continues to deny Class Members access to non-CVS pharmacies and pharmacists by utilizing its discretion and incentivizing employers, such as AMTRAK, to make those pharmacies and pharmacists "out-of-network" for HIV/AIDS Medications, or not properly advising enrollees they can elect not to use that Program.

2.      CVS Caremark does not merely administer a prescription drug benefit plan design directed by the sponsor of the plan such as, for example, an employer sponsor providing a health plan that includes prescription drug benefits provided by CVS Caremark to Class Members. CVS Caremark offers financial inducements to plan sponsors in order to incentivize plan sponsors to enroll Class Members in prescription drug benefit plans subject to the Program with no ability for Class Members to exclude themselves from the Program ("opt-out") and obtain their medications at a community pharmacy of their choice, or to claim they permit that ability to opt-out but not properly advise consumers of that option. CVS also utilizes its discretion to not consistently accept rebates and discounts applicable to such medications, increasing the cost of such medications to plan enrollees. As such, CVS Caremark effectively controls and directs the pharmacy benefits of such plans. Furthermore, as a result of periodic plan renewals with plan sponsors, CVS Caremark has an ongoing ability to alter plan terms and the prescription drug benefits provided thereunder to Class Members. To the extent CVS blames plan sponsors for this decision and claims they are not responsible for that election, companies such as AMTRAK would also be responsible for the acts and practices at issue herein. Plaintiffs therefore also identify AMTRAK as a Defendant because of CVS's claims that it is employers, not CVS, who are responsible for the wrongdoing at issue.

CLASS ACTION COMPLAINT

3.      CVS Caremark has implemented the Program and has not provided Class Members a right to opt-out of the Program, or if and when there is such an opt-out process, proper notice thereof. Each Plaintiff has been subjected to the Program. Each Plaintiff has been harmed or has been threatened with imminent harm, and/or has been forced to expend additional monies as a result of being forced to use the Program.

4.      Plaintiffs seek an order of this Court declaring CVS Caremark's and its plan sponsors' conduct to be in violation of federal and state law and enjoining such continued violations of law. Plaintiffs also seek damages, restitution and disgorgement based on out-of-pocket expenses Class Members either have or may incur as a result of the Program or the profits generated by Defendants' conduct that violates the laws set forth below, as appropriate for the particular causes of action set forth below.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the parties to this action. Named Plaintiffs are residents of California, Defendants transact business in California, and the members of the Class are resident citizens of California as well as other states where the Program has been implemented.

6.      Jurisdiction over Defendants is also proper because they have purposely availed themselves of the privilege of conducting business activities in California and because they currently maintain systematic and continuous business contacts with this State and/or are based here, and do business with thousands of affected enrollees who are residents of this State.

7.      Venue is proper in this District under 28 U.S.C. section 1391 because Defendants maintain substantial operations in this District; at least one of the Plaintiffs and many Class Members either reside or did business with Defendants in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and Defendants entered into transactions and received substantial profits from enrollees who reside in this District.

8.      This Court has subject matter jurisdiction over this action. Federal question jurisdiction exists based on the assertion of claims for violations of the Affordable Care Act

CLASS ACTION COMPLAINT

("ACA"), Employee Retirement Income Security Act ("ERISA"), and the Americans with Disabilities Act ("ADA"). Plaintiffs also allege subject matter jurisdiction for the state law claims based on the Class Action Fairness Act (28 U.S.C. § 1332(d)), as the parties are from different states and the amount in controversy may be in excess of $5 million.

## THE PARTIES

9.     On personal knowledge, JOHN DOE ONE is a resident of Napa County, California. JOHN DOE ONE has received his pharmacy benefits through CVS Caremark since 2004 but until 2015 JOHN DOE ONE could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies, with full insurance benefits. For over six years, JOHN DOE ONE purchased his HIV/AIDS Medication from a non-CVS pharmacy located in Napa, California and developed a personal relationship with his pharmacist. Since January 2015, the HIV/AIDS Medication prescribed to JOHN DOE ONE is subject to the Program. He has been required to pay full-price with no insurance benefits to obtain his medication from the in-network pharmacy of his choice or use the Program he does not wish to use. His requests to opt-out of the Program have been declined.

10.    On personal knowledge, JOHN DOE TWO is a resident of Ventura County, California. For the past 20 years, JOHN DOE TWO has purchased his HIV/AIDS Medications from Eddie's Pharmacy, a local specialty pharmacy located in Los Angeles, California that serves HIV/AIDS patients. Since at least 2013, JOHN DOE TWO has received his pharmacy benefits through CVS Caremark but until January 1, 2016, JOHN DOE TWO could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies, with full insurance benefits. Since January 2016, the HIV/AIDS Medications prescribed for JOHN DOE TWO have been subject to the Program. Beginning in January 2016 JOHN DOE TWO was required to obtain his medications under the Program, putting his health and privacy at risk. JOHN DOE TWO has contacted CVS Caremark on numerous occasions in an attempt to opt-out of the Program, including requests in writing. However, JOHN DOE TWO's requests to opt-out of the Program have consistently been denied.

11.    On personal knowledge, JOHN DOE THREE is a resident of Los Angeles

CLASS ACTION COMPLAINT

County, California. For the past 15 years, JOHN DOE THREE has purchased his HIV/AIDS Medications from a community pharmacy located in Los Angeles, California. Since at least 2013, JOHN DOE THREE has received his pharmacy benefits through CVS Caremark, but until 2016 JOHN DOE THREE could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies with full insurance benefits. As of January 2016, the HIV/AIDS Medications prescribed for JOHN DOE THREE are subject to the Program. JOHN DOE THREE has contacted his employer's health insurance carrier in an attempt to opt-out of the Program. However, JOHN DOE THREE's requests to opt-out of the Program have been denied. He is now required to utilize the Program or pay full-price with no insurance benefits to obtain his medications from his community pharmacy, and he can no longer use the specialty pharmacist of his choice. He has been forced to use the Program he does not wish to use.

12.    On personal knowledge, JOHN DOE FOUR is a resident of Los Angeles County, California. For the past eight years, JOHN DOE FOUR has purchased his HIV/AIDS Medications from a community pharmacy located in Los Angeles, California. Since at least 2013, JOHN DOE FOUR has received his pharmacy benefits through CVS Caremark, but until 2016 JOHN DOE FOUR could purchase his HIV/AIDS Medications from any in-network pharmacy, including from non-CVS pharmacies with full insurance benefits. As of January 2016, the HIV/AIDS Medications prescribed for JOHN DOE FOUR were subject to the Program. He was required to utilize the Program or pay full-price with no insurance benefits to obtain his medications from his community pharmacy, and could no longer use the specialty pharmacist of his choice.

13.    Defendants CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, L.L.C., Caremark, L.L.C., and Caremark California Specialty Pharmacy, L.L.C., are either domestic or foreign corporations or limited liability companies organized under the laws of this State or the States of Rhode Island or Delaware, with their principal places of business and registered agents for service of process being located in at least those states, and/or are registered to do business in this State or are transacting the business of administering pharmacy benefits for health plans and

6

filling specialty prescription requests made in and from this State.

14.    Defendant National Railroad Passenger Corporation (d/b/a AMTRAK) is a for-profit corporation with its principal place of business located in Washington, D.C. AMTRAK is the self-insured plan sponsor for one of the Plaintiffs. Defendant AMTRAK is registered to do business in this State or is transacting the business of sponsoring health plans for employees located in this State. Plaintiffs are only bringing this claim against AMTRAK as to Class Members who are members of an AMTRAK sponsored health plan, and because CVS claims that AMTRAK is solely responsible for the violations of law at issue herein as to such persons.

15.    The true names, roles and/or capacities of Defendants named as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs and, therefore, are named as Defendants under fictitious names as permitted by the rules of this Court. Plaintiffs will identify their true identities and their involvement in the wrongdoing at issue if and when they become known.

16.    Defendants' conduct described herein was undertaken or authorized by Defendants' officers or managing agents who were responsible for supervision and operations decisions relating to the Program. The described conduct of said managing agents and individuals was therefore undertaken on behalf of Defendants. Defendants had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by such managing agents. By engaging in the conduct described herein, Defendants have agreed with each other to require Class Members to use the wholly-owned CVS Health Corporation's specialty pharmacy subsidiary under the Program, providing members with no realistic alternative or clear notice of their option not to do so, to the exclusion of their trusted community pharmacy and/or specialty pharmacist. As a result of such agreements, Defendants conspired and aided and abetted each other in violating the laws set forth herein, which conduct is on-going.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### *JOHN DOE ONE*

17.    On personal knowledge, JOHN DOE ONE has been HIV positive since approximately August 1998. JOHN DOE ONE receives health insurance from his employer. The

7

pharmacy benefit for his health plan is administered by CVS Caremark. JOHN DOE ONE currently takes one HIV/AIDS Medication subject to the Program, Triumeq.

18.     On January 19, 2015, JOHN DOE ONE received a phone call from his local pharmacy. His pharmacist informed him that his prescriptions were no longer approved at the pharmacy. JOHN DOE ONE called CVS Caremark and spoke to a CVS Caremark representative, who informed him that he must obtain his prescriptions under the Program or pay full-price for his medications. A month's supply of his HIV/AIDS Medication costs more than $2,000. JOHN DOE ONE explains, "I received no written notice to prepare for this impending policy change. I had to scramble into action since I only had a seven-day supply remaining." Running low on his HIV/AIDS Medications, JOHN DOE ONE had no choice but to enroll in the Program.

19.     That same evening, JOHN DOE ONE called CVS Caremark and spoke to a representative. JOHN DOE ONE demanded to get his medications from his local pharmacy. The CVS Caremark representative reiterated that he had to get his prescriptions through the Program if he wanted his medication or else pay out-of-pocket.

20.     JOHN DOE ONE has, on several occasions, expressly requested to opt-out of the Program. JOHN DOE ONE has emailed CVS Caremark and requested an explanation on "why [his] medications were halted at the retail pharmacy." In response, CVS Caremark said that his medications must be filled by CVS Caremark's Specialty Pharmacy Program.

21.     On January 21, 2015, JOHN DOE ONE received his first shipment of Triumeq. When JOHN DOE ONE returned home he found his 90-day supply of HIV/AIDS Medication baking in the afternoon sun. Storage at high temperatures can quickly degrade the potency and stability of many medications.

22.     After the disastrous experience with his first mail-order shipment, JOHN DOE ONE has picked up his HIV/AIDS Medication at a CVS Pharmacy. CVS Caremark mails the medication to a CVS Pharmacy, but only as a drop shipment location purely for pickup, with no advice provided by a pharmacist. JOHN DOE ONE has never received or been offered a consultation with a pharmacist regarding his HIV/AIDS Medication during his pickups. Unlike

8

JOHN DOE ONE's community pharmacy, which is now considered "out-of-network," CVS Caremark does not provide reminders when his prescription needs to be renewed. Furthermore, CVS Caremark does not coordinate with the AIDS Drug Assistance Program ("ADAP"), a government program that provides co-pay assistance for HIV/AIDS Medications. Now, in order to receive assistance from ADAP, JOHN DOE ONE must "pay the co-pay first at CVS Pharmacy, wait for the invoice, and then submit the claim to ADAP for reimbursement." JOHN DOE ONE "never received the invoice for October 2015—despite calling and asking for it—and missed ADAP's 60-day period in which to file for reimbursement." JOHN DOE ONE's out-of-pocket loss for October 2015 alone was $60.00.

23.    To make matters worse, JOHN DOE ONE's HIV/AIDS Medication were filled by CVS Caremark and his non-HIV/AIDS Medications, including Bupropion, an antidepressant, are filled by his local pharmacy. JOHN DOE ONE has to manage his prescriptions and spend time going between his local pharmacy and CVS Caremark. CVS Caremark does not have a full and accurate record of all of the medications JOHN DOE ONE is taking and cannot anticipate or warn against potential adverse drug interactions, which are common with HIV/AIDS Medications.

24.    On March 30, 2016, JOHN DOE ONE submitted, via certified mail, a letter to both his employer and CVS Caremark formally requesting that he be allowed to opt-out of the Program. JOHN DOE ONE received a letter dated April 4, 2016 from CVS Caremark denying his request and directing him to file a second level appeal. On May 17, 2016, JOHN DOE ONE filed the second level appeal as directed. In a letter from CVS Caremark dated May 20, 2016, CVS Caremark informed JOHN DOE ONE that CVS Caremark had made a "final determination" denying his opt-out request. JOHN DOE ONE followed the appeal process as set forth in his plan documents.

25.    The Program raises both practical and privacy concerns. JOHN DOE ONE is away from home several days a week. JOHN DOE ONE must pick up his medications before he leaves to ensure that he does not run out of his medications while he is away. If his medications were delivered to his home, they would be left on his doorstep.

CLASS ACTION COMPLAINT

26.    JOHN DOE ONE has built a very close relationship with his local pharmacy. JOHN DOE ONE's local pharmacy coordinated his ADAP payments and reminded him when his medications were ready for pickup. JOHN DOE ONE's local pharmacy can also provide essential counseling services regarding his HIV/AIDS Medication. In comparison, when JOHN DOE ONE called CVS Caremark for counseling services, he was transferred multiple times and told to call back.

27.    JOHN DOE ONE's present and on-going experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illness. In the words of JOHN DOE ONE, the Program has resulted in, as JOHN DOE ONE describes it, a "fractured and splintered medication retrieval" system that serves only to add additional stress to JOHN DOE ONE's life.

### *JOHN DOE TWO*

28.    On personal knowledge, JOHN DOE TWO has been HIV positive since 1996. In addition, JOHN DOE TWO has several chronic health conditions, including congestive heart failure and stage four kidney failure. JOHN DOE TWO receives health insurance through his husband's employer and the pharmacy benefit for his health plan is administered by CVS Caremark. JOHN DOE TWO currently takes three HIV/AIDS Medications (Epivir, Selzentry, and Tivicay) that are subject to the Program.

29.    For approximately four years prior to the implementation of the Program, CVS Caremark administered JOHN DOE TWO's pharmacy benefits. Throughout this period, JOHN DOE TWO was able to obtain his HIV/AIDS Medications from a retail specialty pharmacy that specializes in serving HIV/AIDS patients. In October 2015, JOHN DOE TWO's husband received a letter from CVS Caremark that stated that he was required to enroll in the Program beginning January 1, 2016. The letter provided "effective January 1 [2016]," members "taking a long-term maintenance medication … must choose to receive [their] 90-day supply by mail or pick them up at a retail CVS/pharmacy." The letter also stated that the plan "will allow two 30-day fills of a long-term medication" at a local pharmacy. JOHN DOE TWO did not receive the same communication from CVS Caremark. The following month, in November 2015, JOHN

10

DOE TWO received a letter from CVS Caremark, which stated that he had "reached [his] plan limit for filling 30-day supplies at a retail pharmacy" and would have to pay the full cost of his medications if he did not receive 90-day supplies of his medications through the Program.

30.    Beginning in January 2016, JOHN DOE TWO had to obtain his HIV/AIDS Medications under the Program but does not want to pick up his medications from a CVS pharmacy due to significant privacy concerns. At his local specialty pharmacy, JOHN DOE TWO can enter a private screened section of the pharmacy to receive a consultation and ask questions. In comparison, nearby CVS pharmacies do not have a private area for picking up medications and consultations. JOHN DOE TWO explains: "At my retail specialty pharmacy, they have a little alcove for privacy. I can take my medications out and match it with a list I have of all my drugs. I can meet with my pharmacist and explain any changes I have felt and ask any questions I have. At CVS, I am within hearing distance of everyone waiting in line, including many people who do not have HIV/AIDS. I can hear other patients' questions and the pharmacists' answer. I am concerned with other people finding out about my HIV positive status."

31.    As a result, JOHN DOE TWO has had no choice but to pick up his prescriptions from the closest CVS retail pharmacy that offers a private consultation room, which is 50 miles from his home round-trip. As JOHN DOE TWO cannot drive himself, his husband has been required to drive him to the pharmacy as well as to assist in carrying out JOHN DOE TWO's 21–24 prescriptions. Each time JOHN DOE TWO has attempted to pick up his prescriptions from the retail CVS location, JOHN DOE TWO has encountered problems that require a return to the store, including missing and inadequate amounts of medication (*e.g.,* only 60-days' worth of HIV/AIDS Medication for a 90-day prescription). In fact, JOHN DOE TWO was informed by the retail pharmacist that he does not even open the specialty medication shipments when they come in, let alone verify that the shipment is correct or whether there is any new information that should be passed along to JOHN DOE TWO. According to JOHN DOE TWO, "every refill involves a new surprise in trying to learn their system."

32.    JOHN DOE TWO requested to have a specific representative appointed as a

CLASS ACTION COMPLAINT

contact at the beginning of his experience, but the "patient advocate" system employed by CVS Caremark has only added another layer of bureaucracy that has resulted in more confusion and issues. On multiple occasions, JOHN DOE TWO's patient advocate has either been too busy or unavailable to assist him.

33.    JOHN DOE TWO takes many medications every day and wants to obtain all those medications from his local community pharmacy so that his local pharmacist can help coordinate his medications and monitor for adverse drug interactions and possible side effects. JOHN DOE TWO has come to rely on the watchful eye of his specialty pharmacist. For example, following a hospital stay relating to JOHN DOE TWO's kidney problems, the discharging physician prescribed Bactrim DS. Because JOHN DOE TWO's specialty pharmacist is familiar with JOHN DOE TWO's medical history, including his kidney failure, the pharmacist advised JOHN DOE TWO that the dosage strength of the prescribed Bactrim DS was incorrect. JOHN DOE TWO called his nephrologist, who agreed with the pharmacist's conclusion.

34.    JOHN DOE TWO was previously required to obtain his medications by mail-order when his prescription drug benefit was administered by Express Scripts, Inc. The experience was disastrous. After multiple delivery and privacy problems, JOHN DOE TWO was allowed to opt-out of the mail-order program and return to his local specialty pharmacy.

35.    JOHN DOE TWO has built a very close relationship with his local specialty pharmacy. JOHN DOE TWO explains: "My pharmacist knows me, my medical conditions and history, and is immediately available for consultation. He coordinates my monthly refills so that all my prescriptions, some of which require refrigeration, are available for pick-up at one time."

36.    In comparison, the CVS Caremark representatives JOHN DOE TWO has dealt with appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients, resulting in the reduction or effective elimination of such benefits. The individuals who work in the CVS Caremark mail-order call centers and interact with members who need these medications have no specialized training as to HIV/AIDS Medications, and it is clear from JOHN DOE's interactions with staff members that both the specialty pharmacies and retail pharmacies are woefully understaffed, overworked, and inexperienced. The retail pharmacist

CLASS ACTION COMPLAINT

JOHN DOE TWO has been forced to receive his medications from has said, "I studied HIV medicine in school but I don't have any current experience."

37.    JOHN DOE TWO has expended substantial resources attempting to resolve the issues raised herein, spending hours on the phone with CVS Caremark representatives. JOHN DOE TWO has, on several occasions, expressly requested to opt-out of the Program with CVS Caremark and his husband's former employer. Between October 2015 (when his husband received the first letter referenced above) and March 2016, JOHN DOE TWO called CVS Caremark more than 20 times in an attempt to opt-out of the Program. A CVS Caremark representative named Lisa informed him that she would try to appeal on his behalf. However, her supervisor denied the appeal. In addition, on January 11, 2016 and February 28, 2016, JOHN DOE TWO submitted letters to CVS Caremark requesting to opt-out of the Program. Those requests were either ignored or denied. Prior to filing this action, he contacted his employer benefits representative and CVS Caremark once again to opt-out of the Program, and once again was subjected to a 40 minute call. The employer representative informed JOHN DOE TWO that only CVS Caremark could decide whether to grant such requests. The CVS Caremark representative he then spoke with stated there was no provision in JOHN DOE TWO's health plan allowing him to opt-out of the Program, nor would there be for 2018, and confirmed this policy applied to specialty HIV/AIDS Medications. Furthermore, the CVS Caremark representative stated that since JOHN DOE TWO obtained HIV/AIDS Medications under the Program, all of his medications—including non-HIV specialty medications and non-specialty medications not subject to the Program—must also be obtained through the Program. After detailing his experience of obtaining his prescriptions through the Program the CVS Caremark representative stated she genuinely wished that she could do something to help, but said there was nothing she could do. JOHN DOE TWO sums up the conversation this way: "I have had so many conversations with CVS Caremark personnel who recognize the limitations of the Program and are supportive about my desire to go to the pharmacist who knows me and my medications. [The CVS representative] actually said other employees ask her after nine years in her position, 'how do you stand it?'"

CLASS ACTION COMPLAINT

38.     On April 1, 2016, JOHN DOE TWO submitted, via certified mail, a letter to both his husband's former employer and CVS Caremark requesting, once again, that he be allowed to opt-out of the Program. JOHN DOE TWO received a letter dated April 4, 2016 from CVS Caremark denying his request and directing him to file a second level appeal. On May 11, 2016, JOHN DOE TWO filed the second level appeal as directed. In a letter from CVS Caremark dated May 16, 2016, CVS Caremark informed JOHN DOE ONE that it had made a "final determination" denying his opt-out request. JOHN DOE TWO followed the appeal process as set forth in his plan documents. Ultimately, CVS Caremark has denied all of his opt-out requests and informed him that all HIV/AIDS Medications must be obtained under the Program.

39.     JOHN DOE TWO's present and on-going experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illnesses. JOHN DOE TWO's physician has told him to do everything he can to reduce stress in his life, especially as JOHN DOE TWO has had multiple heart attacks, strokes, open heart surgery and has had numerous cardiac stents placed to keep him alive. As a result of the stress from the Program, JOHN DOE TWO has received a prescription for Wellbutrin, an antidepressant medication.

### *JOHN DOE THREE*

40.     On personal knowledge, JOHN DOE THREE has been taking HIV/AIDS Medications for 15 years. JOHN DOE THREE is insured through his former employer's health insurance carrier, Anthem Blue Cross and Blue Shield, and the pharmacy benefit for his health plan is administered by CVS Caremark, which has been the pharmacy benefit provider for his former employer since at least 2013. He had previously been able to obtain his three HIV/AIDS Medications (Intelence, Isentress and Reyataz) from his neighborhood specialty pharmacy. In December 2015, JOHN DOE THREE received a communication from CVS Caremark that he would have to enroll in the Program in 2016, but that he could receive an initial order and two refills at any pharmacy—an amount of medication equal to a three-month supply. However, when he went to his local pharmacy in Los Angeles, California on January 8, 2016 to refill a prescription for his HIV/AIDS Medications, a CVS Caremark representative informed JOHN

DOES THREE's neighborhood specialty pharmacy that CVS Caremark would not process payment, and that JOHN DOE THREE would have to immediately enroll in the Program in order to obtain his medications. JOHN DOE THREE called both his former employer and CVS Caremark. After numerous calls, CVS Caremark gave him a one-time exception and allowed his pharmacy to fill his HIV/AIDS Medications, but only for January 2016. CVS Caremark insists that prescriptions for all specialty medications must be filled through the Program and that it no longer permits the three-month grace period it had allowed in the past.

41.    JOHN DOE THREE was also informed that CVS Caremark's Program now requires JOHN DOE THREE to order a single month of medication at a time, requiring JOHN DOE THREE to incur additional out-of-pocket costs on a monthly basis and increasing the financial burden imposed by the Program.

42.    JOHN DOE THREE has, on several occasions, expressly requested to opt-out of the Program. His requests and appeal were denied on the basis that there has been a change to his former employer's benefit plan. On March 24, 2016, JOHN DOE THREE submitted, via certified mail, a letter to both his former employer and CVS Caremark to formally request that he be allowed to opt-out of the Program; he received no response from either. JOHN DOE THREE followed the appeal process as set forth in his plan documents, to no avail. Before this lawsuit was filed, JOHN DOE THREE contacted his former employer once again and asked to opt-out of the Program so that he can obtain his HIV/AIDS Medications at a community pharmacy of his choice. The benefits manager referred him to CVS Caremark. The person he spoke to at CVS Caremark said there is no such option. As JOHN DOE THREE says, "I persisted and asked her if there was any change during the past year so I could get up to date information on my plan, and she said there was none and directed me to my employer's Benefits 'welcome package' I was supposed to receive in the mail."

43.    JOHN DOE THREE describes his experience with CVS Caremark's Program as an "odious burden" and states that the entire process is "unreliable and clumsy." For example, on one occasion when JOHN DOE THREE used CVS Caremark's Program to obtain his medication, the package he received only contained part of his prescription. When JOHN DOE

15

THREE called CVS Caremark to inform them of the mistake, the CVS Caremark customer service representative insisted that the order was complete and told JOHN DOE THREE that he would have to file a police report so the police could determine whether the medications had been stolen. The next day, the remainder of the incomplete order arrived. The lengthy phone calls and additional stress to JOHN DOE THREE would have been avoided entirely had he not been subject to the Program. JOHN DOE THREE also believes that the Program does not have adequate systems in place to communicate with his doctor with regard to the timing of prescription refills, resulting in additional calls to the doctor and stress and concern to JOHN DOE THREE regarding whether he will receive his prescriptions in a timely manner. Furthermore, because the neighborhood in which JOHN DOE THREE resides has in fact recently seen theft of mail parcels, JOHN DOE THREE must remain at home for the entire day on which a delivery of his medication is to occur in order to guard against theft, resulting in missed doctor appointments that are critical to the maintenance of JOHN DOE THREE's condition.

44.     JOHN DOE THREE has built a very close relationship with his local pharmacist, who is knowledgeable and understands the subtle nuances of HIV/AIDS Medications. He has used his local neighborhood pharmacy since 1990. His local pharmacy is very highly regarded in the community and was the first pharmacy in Los Angeles to specialize in HIV patient care. On more than one occasion, when JOHN DOE THREE was particularly ill, he has called his local pharmacist, who has in turn called JOHN DOE THREE's doctor to obtain the necessary prescription from the doctor. JOHN DOE THREE and others depend on these types of longstanding relationships with local pharmacists to maximize the benefits of HIV/AIDS Medications and to treat the complex and ever-changing needs of HIV/AIDS patients.

45.     In comparison, the CVS Caremark representatives JOHN DOE THREE has dealt with appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients, resulting in the reduction or effective elimination of such benefits. CVS Caremark is also unwilling to work to provide him the manufacturer rebates he would obtain by continuing to work with his local pharmacist, thus increasing his payments by an estimated $400 per month,

16

which on his fixed income he cannot afford for an extended period. JOHN DOE THREE has also been forced to take the additional step of enrolling in Medicare Part D as a "back-up" to assure that he will have timely and necessary access to his HIV/AIDS Medications. This additional coverage, which should not be necessary, will cost JOHN DOE THREE thousands of dollars in premiums and other costs throughout the year. Further, JOHN DOE THREE shares the same financial concerns as JOHN DOE ONE and JOHN DOE TWO in terms of the impact of the Program on the affordability of his medications.

46.    JOHN DOE THREE's present and on-going experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illness. Because he is being forced into the mail order Program, JOHN DOE THREE has sought to renew his prescription for anxiety medication, at additional personal cost.

*JOHN DOE FOUR*

47.    On personal knowledge, JOHN DOE FOUR has been taking HIV/AIDS Medications for more than 10 years. JOHN DOE FOUR was insured through the health plan of his spouse, JOHN DOE THREE. The pharmacy benefit for that health plan is administered by CVS Caremark, which has been the pharmacy benefit provider for the plan since at least 2013. He had previously been able to obtain his various approved HIV/AIDS Medications from his neighborhood specialty pharmacy. In December 2015, JOHN DOE FOUR received a communication from CVS Caremark that he would have to enroll in the Program in 2016.

48.    JOHN DOE FOUR has had numerous issues with CVS Caremark's Program. On several occasions, deliveries of critical medications have not arrived on time and/or have not arrived by the date specified by CVS Caremark for delivery. Because a signature is required for delivery of the medications he receives, he must take off work for the entire day in order to receive these deliveries. As a result, even deliveries that arrive on time require him to forgo a day's wages—approximately $200. When deliveries of his medications do not arrive on the date projected by CVS Caremark, as often occurs, he is forced to forgo multiple days' wages simply to obtain medications that are critical to his health. Of course, late delivery of his medications

17

CLASS ACTION COMPLAINT

also jeopardizes his health, which deteriorates quickly without his medications, and subjects him to the risk of developing increased drug resistance as a result of missed doses. Accompanying these injuries to his economic and physical well-being comes a feeling of despondence and lack of control over his own health, which is detrimental to his psychological well-being. The unnecessary challenges and sacrifices that CVS Caremark's Program imposes on JOHN DOE FOUR result in stress and obstacles to medication compliance.

49.     Further, JOHN DOE FOUR has received and been billed for, without his consent, deliveries of medications that were not set for automatic refill, including medications that he, in consultation with his physician, had discontinued. In such instances, his credit card has been charged for delivery of these medications without his consent. With his limited income, such unanticipated and unauthorized charges cause him significant financial stress.

50.     JOHN DOE FOUR was also informed that CVS Caremark's Program now requires JOHN DOE FOUR to order a single month of medication at a time, requiring JOHN DOE FOUR to incur additional out-of-pocket costs on a monthly basis and increasing the financial burden imposed by the Program.

51.     JOHN DOE FOUR has built a very close relationship with his local pharmacist, who is knowledgeable and understands the subtle nuances of HIV/AIDS Medications. He has used his local neighborhood pharmacy since 2010. His local pharmacy is very highly regarded in the community and was the first pharmacy in Los Angeles to specialize in HIV patient care. On more than one occasion, he has called his local pharmacist who has in turn called JOHN DOE FOUR's doctor to obtain the necessary prescription from the doctor. JOHN DOE FOUR and others depend on these types of longstanding relationships with local pharmacists to maximize the benefits of HIV/AIDS Medications and to treat the complex and ever-changing needs of HIV/AIDS patients.

52.     In comparison, the CVS Caremark representatives JOHN DOE FOUR has dealt with appear to have no specialized knowledge about HIV/AIDS Medications or the concerns of HIV patients, resulting in the reduction or effective elimination of such benefits. CVS Caremark is also unwilling to work to provide him the manufacturer rebates he would obtain by continuing

CLASS ACTION COMPLAINT

to work with his local pharmacist, thus increasing his payments by an estimated $200 per month, which, at his income level, he cannot afford for an extended period. Further, JOHN DOE FOUR shares the same financial concerns as the other Plaintiffs in terms of the impact of the Program on the affordability of his specialty medications. Specifically, CVS Caremark routinely delays delivery of JOHN DOE FOUR's medications on the basis that he has not satisfied his cost-share obligation. Each time, JOHN DOE FOUR is required to contact CVS Caremark, often requiring a substantial investment of time spent on the phone, in order to remind them of his participation in ADAP and provide them the information related to that program yet again. The failure of CVS Caremark's Program to retain and apply this information from one prescription fill to the next results in increased stress and delayed treatment for JOHN DOE FOUR. In comparison, JOHN DOE FOUR's neighborhood specialty pharmacy coordinated ADAP coverage for his prescription medications without intervention, insistence, or reminder on the part of JOHN DOE FOUR.

53.    Furthermore, because the neighborhood in which JOHN DOE FOUR resides has in fact recently seen theft of mail parcels, JOHN DOE FOUR must remain at home for the entire day on which a delivery of his medication is to occur in order to guard against theft, resulting in missed doctor appointments that are critical to the maintenance of JOHN DOE THREE's condition.

54.    JOHN DOE FOUR's present and on-going experience with CVS Caremark's Program has dramatically increased his stress. Stress plays a part in undermining the human immune system and is detrimental to people with chronic illness. Because he was forced into using the Program, JOHN DOE FOUR has sought to renew his prescription for anxiety medication, at additional personal cost.

## STATEMENT OF FACTS

55.    The Program results in a reduction in or elimination of health plans' drug benefits, effectuated by transforming drug purchases at community pharmacies from an "in-network" covered benefit to an "out-of-network" payment. Under the Program, patients using a non-CVS community pharmacy will be considered going "out-of-network" and will be subject to

CLASS ACTION COMPLAINT

increased "out-of-network" charges or may not have these medications covered at all. Class Members also face a potential or actual increase in out-of-pocket expenses, as co-pays or discounts or rebates that were otherwise covered or recognized may not be consistently covered by or recognized under the Program at the discretion of CVS to elect whether to do so, resulting in an overall increased cost for the same benefits. As part of the prescription drug plans it offers, one of CVS Caremark's roles as a prescription drug benefit administrator for any plan sponsor or health plan it contracts with is to establish and contractually control which, if any, non-CVS pharmacies are "in-network," thereby determining where Class Members may purchase their prescription drugs with full insurance coverage.

56.    As a result of Defendants' discriminatory behavior, HIV/AIDS patients face a potentially life-threatening decision that also threatens their privacy and reduces their current health plan' drug benefits. They must either: (i) forego essential counseling from an expert pharmacist at a community pharmacy and face risks to their privacy that are inherent in the Program, since even where CSP permits deliveries to CVS pharmacies, they are only for drop shipment as compared to being filled there and subject to active consultation by a pharmacist; or (ii) pay hundreds or thousands of dollars out-of-pocket monthly for their medications at their non-CVS community pharmacy.

57.    The community specialty pharmacist knows patients' medical history and, working directly with patients in face-to-face interactions and with specific training in HIV/AIDS Medications, is best positioned to: (i) detect potentially life-threatening adverse drug interactions and dangerous side effects, some of which may only be detected visually; (ii) immediately provide new drug regimens as their disease progresses; and (iii) provide essential advice and counseling that help HIV/AIDS patients and families navigate the challenges of living with a chronic and sometimes debilitating condition. Defendants' Program is further flawed because it does not allow some subscribers to transfer all of their medications to a single provider. Instead, CVS Caremark's Program is in fact two distinct programs for many subscribers—one for regular medications, and a separate program for specialty medications. This means that many patients, including JOHN DOE ONE, JOHN DOE THREE, and JOHN DOE

CLASS ACTION COMPLAINT

FOUR, must manage prescriptions between community pharmacies and the Program. This "separate and unequal" splitting of prescription providers also makes it difficult if not impossible for CVS Caremark to track potentially life-threatening drug interactions, as discussed below.

58.    To the extent applicable to them, Plaintiffs have exhausted available administrative remedies with regard to opting-out of the Program. In response, CVS or the plan sponsors either did not formally respond to these opt-out requests or refused to permit Plaintiffs to opt-out of the Program. Plaintiffs therefore bring this action on behalf of themselves and on behalf of a class (defined herein) of residents in the United States who: (i) are or were enrolled in a health care plan that includes a prescription drug benefit that is administered by CVS Caremark; and (ii) have been prescribed specialty HIV/AIDS Medications subject to the Program.

59.    For all but the wealthiest HIV/AIDS patients, the dramatic cost increases and/or reductions in or elimination of benefits of coverage associated with the Program are untenable, and thus many Class Members are left with no choice but to risk their health and privacy by obtaining their life-sustaining medications through the Program.

60.    This limitation is a material change to and reduction or elimination of benefits in Class Members' pharmacy benefits and violates both federal and state law as described herein. One harmful impact of this policy is that the Program does not allow for early refills; patients cannot refill their HIV/AIDS Medication until the very end of their current prescription. As a result, enrollees will be forced to call or fax CSP to re-order drugs during a very narrow period of time each month, often requiring them to coordinate with their physicians as further described below. If there are: (i) circumstances that make it difficult for the patient to re-order drugs at the designated time—such as with JOHN DOE ONE, for example, who works out of town for days at a time—or other workload and travel commitments or illness; or (ii) billing, processing or mail complications or delays (such as happened with JOHN DOES TWO, THREE and FOUR), HIV/AIDS patients will likely miss doses and potentially experience serious health problems as a result.

61.    In addition to the potentially life-threatening health consequences of the Program

CLASS ACTION COMPLAINT

as discussed below, Class Members' fundamental and inalienable right to privacy is also threatened. An improper disclosure of a person's HIV or AIDS status can often result in the denial of proper health care, poor treatment in educational and work settings, and many other collateral consequences. *See Activities Combating HIV Stigma and Discrimination,* HIV.gov, https://www.hiv.gov/federal-response/federal-activities-agencies/activities-combating-hiv-

stigma-and-discrimination (last visited January 31, 2018). Ninety percent of Americans recognize that people living with HIV and AIDS face prejudice and discrimination, and roughly one in eight people living with HIV is denied health services because of such stigma and discrimination associated with the disease. *See* Henry J. Kaiser Family Foundation, the Washington Post/Henry J. Kaiser Family Foundation 2012 Survey of Americans on HIV/AIDS (July 2012); *see also HIV Stigma and Discrimination,* AVERT, https://www.avert.org/professionals/hiv-social-issues/stigma-discrimination (last visited January 31, 2018). For the roughly one million Americans living with HIV/AIDS, the "painful stigma and discrimination continue to permeate their daily lives."[3] *Eradicating Discrimination Against People Living With HIV/AIDS,* U.S. Dept. of Justice Archives, https://www.justice.gov/archives/opa/blog/eradicating-discrimination-against-people-living-

hivaids (last visited January 30. 2018). Class Members who live in apartment buildings or will be required to have medications delivered to their work place have expressed alarm that neighbors and co-workers, who do not know that the recipient has HIV/AIDS, will come to

---

[3] "HIV stigma and discrimination can pose complex barriers to prevention, testing, treatment, and support for people living with or at risk for HIV. Some examples of stigma include being shunned by family, peers, and the wider community; receiving poor treatment in health care and education settings; and experiencing judgmental attitudes, insults, or harassment. Some individuals with HIV have been denied or lost employment, housing, and other services; prevented from receiving health care; denied access to educational and training programs; and have been victims of violence and hate crimes. HIV-related stigma and discrimination prevents individuals from learning about their HIV status, disclosing their status even to family members and sexual partners, and/or accessing medical care and treatment, weakening their ability to protect themselves from getting or transmitting HIV, and to stay healthy." *Activities Combating HIV Stigma and Discrimination*, HIV.gov, https://www.hiv.gov/federal-response/federalactivities- agencies/activities-combating-hiv-stigma-and-discrimination (last visited Jan. 30, 2018).

CLASS ACTION COMPLAINT

suspect that they are ill. Mail-order shipments also present the risk of lost or stolen medications, as each shipment of medications may be worth thousands of dollars. CVS Caremark claims Class Members bear the financial risk of lost shipments left at their door or in their mailbox. Alternatively, the recipient may need to be present when the package is delivered, thus forcing the patient to obtain needed medications on the schedule of the delivery person, which raises further privacy and personal liberty concerns or requires them to miss hours or days of work waiting for deliveries. Furthermore, if a Class Member obtains his or her HIV/AIDS Medications from a CVS pharmacy, he or she must discuss those medications with pharmacy personnel with whom he or she does not know and are likely not aware of their disability or medical condition, in violation of their right to privacy. All Class Members must discuss their HIV/AIDS status with CSP personnel over the phone.

62.    Even if they elect to not use mail order but rather a regular CVS pharmacy for pick-up of their HIV/AIDS Medications under the Program, Class Members still face serious health and privacy issues. The pharmacists at a CVS pharmacy do not fill the HIV/AIDS Medication prescriptions. Such pharmacists are generally unable to provide any counseling services related to the HIV/AIDS Medications. Class Members may be forced to fill their HIV/AIDS Medication prescriptions at full-cost at their local pharmacies just so they can receive the personalized services they need from their established community pharmacists. Class Members in such a situation run the risk of having to manage their prescriptions between their local pharmacy and CVS Caremark by themselves. CVS Caremark also may not have a full and accurate record of all of the medications the Class Members are taking and cannot anticipate or warn against potential adverse drug interactions, which are common with HIV/AIDS Medications. Additionally, similar to mail-order, Class Members must wait for their HIV/AIDS Medications to ship to a CVS pharmacy and face delays and lost shipments.

63.    Furthermore, CVS pharmacy personnel do not have the same level of sensitivity as Class Members' local pharmacy staff. For example, Class Members have reported that CVS personnel shouted the name of their HIV/AIDS Medications across the room in front of other customers, raising severe privacy concerns and making it untenable to pick up their medications

23

CLASS ACTION COMPLAINT

at a CVS pharmacy in the future.

64.    Drop shipment to a CVS pharmacy is simply not the same benefit as having access to a local pharmacy where pharmacists are aware of Class Members' drug history and regimen. Even though Class Members are given a choice to have their HIV/AIDS Medications delivered to their home, CVS Caremark does not provide them a window of time when the delivery will take place. As a result, Class Members are forced to wait at home all day to sign for their medications. If Class Members do not have a signature required for their HIV/AIDS Medications, then they face the risk of having their drugs stolen because their HIV/AIDS Medications are left sitting in front of their doors, as stated above. How such medications are delivered, the limited options provided to Plaintiffs and Class Members, the mix ups and delays occasioned by CVS's flawed delivery process, the decision not to constantly apply rebates or discounts, and/or the decisions to offer an opt-out and non-opt-out option to plan sponsors and/or recognize opt-out requests are all matters within CVS's discretion and control.

65.    The Program constitutes a material and discriminatory change in Class Members' coverage, a significant reduction in or elimination of prescription drug benefits, and a violation of the standards of good health care and clinically appropriate care for HIV/AIDS patients. By implementing such practices, CVS Caremark effectively reduces the quality of prescription drug care provided to Class Members, and thus a reduction or elimination of benefits, by forcing enrollees to only obtain such medications through their sister co-conspirator and wholly-owned subsidiary CSP – allowing CVS Caremark to profit through this conduct by keeping hundreds of thousands, if not millions, of dollars in prescription fill fees, possible rebates and other monies to themselves. As a result, many Class Members have already expended resources in response to the Program and presently are threatened with substantial, imminent, and irreparable harm. This harm includes a grave threat to their health and safety, as well as their right to privacy.

66.    The decision to force Class Members to accept CSP as their exclusive provider under the Program, not advise enrollees of opt-out rights in a meaningful way, not timely deliver medications, not consistently applying or accepting rebates or discounts offered by manufacturers and provided to enrollees and/or providing financial incentives to employers to

CLASS ACTION COMPLAINT

enroll in the Program are acts and decisions exclusively in the control and discretion of CVS Caremark. Such decisions are ultimately motivated by profit, as shown by CVS Caremark providing financial incentives to self-funded plans and other plan sponsors to select the Program over a prescription drug benefit plan that allows enrollees to use the pharmacy of their choice. CVS Caremark profits if plan sponsors select a prescription benefit plan that is subject to the Program. As a result of the Program, CVS Caremark and CSP will likely continue to see a substantial increase in revenues and even greater increases in profits as a result of the forced transition of its enrollees.

### The Role of the Clinical Pharmacist and the Importance of

### Face-to-Face Interactions

67.    Many physicians specializing in HIV/AIDS treatment are unable to spend very long with each patient. In fact, physician consultations are often limited to just 15 minutes in the era of managed care. As a result, there is very limited time for the physician to elicit extensive information about the patient's complete medical history, including which non-HIV/AIDS Medications the patient is taking, and impart critical information about prescription drug regimens and warnings about the high number of known adverse side effects and adverse drug interactions associated with HIV/AIDS Medications that need to be monitored. For this reason and the reasons that follow, it is vitally important for HIV/AIDS patients, even as compared to patients taking other "specialty" medications, to have access to in-person consultations, where they can address any and all of the numerous issues and concerns surrounding drug interactions, side effects, and other problems that can arise while living with and managing HIV/AIDS.

68.    HIV/AIDS patients are often prescribed both specialty and non-specialty medications, including over-the-counter medications that do not require a prescription and therefore are not tracked in the same manner as prescription medications. Many HIV/AIDS patients have a history of cardiovascular disease, hypertension, anemia, diabetes, or psychiatric issues, among other conditions. Medications that manage mental health issues, for example, such as antidepressants, anti-psychotics, and sleep agents, among others, are often not prescribed by the physician managing the patient's HIV/AIDS conditions. Since for many patients only

25

CLASS ACTION COMPLAINT

specialty medications are to be filled by CVS Caremark's wholly-owned subsidiary CSP, and non-specialty medications may be filled at the patient's community pharmacy, CSP may not always have a full and accurate record of all the medications the patient is taking and therefore cannot anticipate or warn against potential adverse drug interactions, which are common with HIV/AIDS Medications. Even worse, CVS Caremark uses its discretion to require some enrollees to fulfill both specialty and non-specialty medications using the Program, thereby denying them the benefit of any direct pharmacist consultation.

69.    But for the Program, a patient's community pharmacist would be aware of the patient's entire medical history, have a comprehensive view of the patient's complete medication load (as compared to only certain specialty medications), and engage in on-going communications with physicians and patients regarding potential issues that may arise concerning drug side effects, adverse drug interactions, and adherence to specialty medications.

70.    The ability of community pharmacists to closely monitor HIV/AIDS patients in face-to-face encounters is life-saving in many instances. In the case of a patient with a history of depression, for example, a community pharmacist can work with the patient through regular "check-ins" as changes in mood, attitudes or day-to-day function would change if an HIV/AIDS Medication, such as Atripla (with documented central nervous system side effects), were prescribed. Other side-effects provide visual cues—changes in skin color, for example—that cannot be detected over the phone. Additionally, community pharmacists, who serve patients prescribed medications by numerous doctors, may have more up-to-date experience and information about potential adverse drug interactions and changes in drug regimens than physicians themselves.

71.    HIV/AIDS patients, therefore, rely on their specialty community pharmacist to remind them how and when drugs must be taken, to review potential side effects with many other medications and to develop strategies to avoid those side effects, and to provide other counseling including what to expect if a patient's drug regimen changes.

72.    Conversely, the CSP personnel with whom Class Members typically directly interact with, particularly over the phone, are not pharmacists, nor do they have specific

26

knowledge about HIV/AIDS, but rather are general customer service representatives with little to no specialized training about HIV/AIDS Medications. Thus, taking the local pharmacist, and the community pharmacy where they provide their services, out of the treatment equation for HIV/AIDS patients, results in a loss and injury to Class Members as it lessens the quality of care and benefits they receive and are entitled to receive under their plans.

73.    This harm is not conjectural or speculative, but real, imminent and severe. "Putting a label on the bottle — that's the least of what we do," Marva Brannum, a clinical specialty pharmacist at Edwin's Prescription Pharmacy in North Hollywood, California, has explained. Ms. Brannum, who has worked with HIV and AIDS patients for 30 years, said working with patients also includes knowing the psychological and social issues involved with their disease states and providing a critical informed link between doctor and patient. Importantly, working with patients directly allows pharmacists to monitor potential adverse drug interactions. "We are an extension of the patient's clinical team," Brannum said.

74.    The Program thus reduces the overall quality of care Class Members receive and reduces or effectively eliminates their health plans' pharmacy benefit, since providing an effective pharmacy benefit for HIV/AIDS patients is not just a question of knowing the drugs the patient uses, but also knowing the patient and all of their medical needs. "The most intricate part that leads to quality outcomes and leads to decreased costs for us is knowing the patient in total," Brannum said.

75.    Patients who need specialty medicines and suffer from complex diseases require complex treatment. Community pharmacists that provide HIV/AIDS Medications build strong personal and clinical relationships with their patients, making sure that they receive the drugs they need when they need them and even providing them discounts for these expensive medications. The community pharmacist is an essential member of the treatment team.

76.    Furthermore, because there is presently no cure for HIV/AIDS, the virus continually mutates around the medications prescribed to treat it, requiring constant monitoring and immediate provision of new medication regimens to address changes in treatment. Periods of medication changes are particularly sensitive times for HIV/AIDS patients. Doctors and

CLASS ACTION COMPLAINT

pharmacists must review the panoply of the patient's medications for potential new adverse drug interactions, and patients must be concerned about addressing new drug side effects in the short term.

77.    The limited options available to obtain HIV/AIDS Medications under the Program also creates the very real risk of delayed, lost or stolen shipments, resulting in dire consequences for many patients who must strictly adhere to their medication regimes or face serious illness or death, as well as potentially serious personal financial liability according to CVS Caremark, who in its discretion claims these losses are the patient's responsibility even though they are occasioned by the mandated use of the Program. Yet, as detailed below, Defendants appear to have no realistic fail-safe procedure in place to allow subscribers to purchase medications at local community pharmacies (or as shown by the experiences of Plaintiffs, even at CVS pharmacies) in the event that such shipments are delayed, lost, or stolen. Unfortunately, theft of HIV/AIDS Medications appears to be more than an isolated event due to the high cost of some of the medications.

78.    CVS Caremark has replaced the present, on-going, close relationship between community pharmacist and patient with a toll-free telephone number that does not and cannot provide the same or similar level of service and benefits as detailed above. Class Members are not provided regular access to a pharmacist with similar qualification levels, if at all. Furthermore, the Program's requirement that Class Members must routinely call-in during a limited time period to renew their prescriptions as explained below—and work their way through automated robocalls, messages and multiple call center staff—increases stress and fatigue for patients, exacerbating their condition.

### Defendants' Discriminatory Business Practices Specifically Target HIV/AIDS Patients

79.    Due to the complex nature of their disease and medications, HIV/AIDS patients are particularly hard hit and discriminated against by requiring patients to obtain their specialty medications exclusively from under the Program. The Program specifically targets and discriminates against individuals that are HIV positive or have AIDS. The Program denies

28

HIV/AIDS patients full and equal access to utilize the in-network pharmacies and method of delivery of their choice specifically because of the medications attributable to their illness, while at the same time permitting other enrollees to enjoy full access to the pharmacies of their choice. This is an arbitrary and harmful distinction, since the pharmacists' role is even more important in caring for HIV/AIDS patients. While the Program may be appropriate for some patients or some medications, it is not appropriate for all patients with complex, chronic conditions, especially illnesses subject to social stigma where privacy is a significant concern like HIV/AIDS, for which the pharmacist does much more than merely dispense specialty medications. The decision to enroll in the Program should be a matter of informed enrollee choice, not an insurance company or administrator mandate. CVS Caremark's change in policy and corresponding reduction in or elimination of benefits creates a particular health risk for HIV/AIDS patients that require time-sensitive treatments. Even worse, CVS Caremark uses its discretion to require some enrollees to fulfill both specialty and non-specialty medications using the Program, so that they are directly discriminated against by being required to go to the lowest common denominator to obtain all of their medications.

80.    When Class Members inform CVS Caremark representatives they do not want to participate in the Program, they are typically told they have no choice, satisfying any requirement to exhaust administrative remedies.

81.    The Affordable Care Act ("ACA"), American with Disabilities Act ("ADA'), California's Unruh Civil Rights Act ("Unruh Act"), and other federal and state laws outlaw deceptive acts or practices and/or discrimination based on disability, medical condition, and other categories. HIV/AIDS is a "disability" under the ADA and ACA, and a "medical condition" and "disability" under the Unruh Act.

82.    CVS Caremark's Program improperly reduces or eliminates benefits, breaching CVS Caremark's fiduciary duties to Class Members and violates numerous provisions of ERISA. CVS Caremark's conduct is also unlawful and unfair, and therefore violates California Business & Professions Code section 17200, *et seq.*, numerous federal and state laws detailed below, as well as privacy rights provided by the California and U.S. Constitutions.

CLASS ACTION COMPLAINT

## DEFENDANTS' CONDUCT VIOLATES NUMEROUS STATUTORY PROVISIONS OF FEDERAL AND STATE LAW

83.    A central tenet of the ACA is to end discrimination against patients based on their health status, health history, or disability. For example, the "guaranteed issue" provision of the ACA bars discrimination on the basis of health condition, barring companies from "impos[ing] any preexisting condition exclusion." (42 U.S.C. § 300gg-3.) Those with HIV/AIDS and other chronic illness stood the most to gain from the elimination of discrimination on the basis of medical condition.

84.    Section 1557 of the ACA provides that "an individual shall not … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" that enters into a "contract of insurance" with the federal government. Section 1557 specifically delineates the design of insurance plan benefits as a potentially discriminatory practice. Section 1557 provides that under any health program or activity, any part of which is receiving federal financial assistance, or any entity established under Title I of the ACA or its amendments, an individual shall not be subjected to discrimination on grounds prohibited under section 504 of the Rehabilitation Act of 1973. The Supreme Court has specified that the relevant inquiry under the Rehabilitation Act for determining if discrimination has occurred is whether "meaningful access" has been provided to individuals with disabilities. (*Alexander v. Choate*, 469 U.S. 287 (1985).) The meaningful access inquiry asks "whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." (*Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2003).)

85.    The Americans with Disabilities Act, 42 U.S.C. section 12182, subdivision (a), provides:

> No individual shall be discriminated against on the basis of *disability* in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or *operates a place of public accommodation.*

(Emphasis added.)

30

86.    For purposes of the ADA, "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." (42 U.S.C. § 12102(4)(A).)

87.    The U.S. Supreme Court has recognized HIV/AIDS as a "disability" subject to the ADA. (*Bragdon v. Abbott*, 118 524 U.S. 624, 655 (1998).)

88.    A pharmacy is a "place of public accommodation" recognized by the ADA. (42 U.S.C. § 12181(7)(F).)

89.    The Ninth Circuit has found that a defendant "operates a place of public accommodation" including if that defendant exerts "control" over a place of public accommodation, for example as a result of a financial or contractual relationship between the defendant and the place of public accommodation. (*See e.g.*, *Lentini v. Cali. Ctr. for the Arts*, 370 F.3d 837, 849 (9th Cir. 2004).)

90.    The Program also violates the ADA. Defendants' discriminatory actions have denied Plaintiffs and members of the Class full and equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations under their health plans' prescription drug benefit. These changes to Class Members' health plans' prescription drug benefit puts Class Members' health and privacy at risk and reduce or effectively eliminate their drug benefit for subscribers prescribed HIV/AIDS Medications forced to obtain those medications solely using the limited options available to Class Members under the Program without an option to opt-out and use the pharmacy and pharmacist of their choice, or not being properly informed they do not need to use the Program to obtain such medications. These changes have made, or will make, HIV/AIDS Medications unaffordable at community pharmacies where expert pharmacists provide life-saving advice and counseling on which Plaintiffs and Class Members have come to rely. Therefore, based on their disability Plaintiffs and Class Members are subject to discriminatory treatment that threatens their health and their privacy.

91.    Defendants' conduct also violates 45 C.F.R. 156.122(e), which effective January 1, 2017 prohibits health plans from requiring the use of mail order for the delivery of medications, including the medications at issue here for the treatment of HIV/AIDS. As a result

of the violation of this regulation, Defendants are engaging in a series of illegal transactions that would violate the ACA, the ADA, ERISA and the state law claims asserted herein.

92.    Article I, section 1 of the California Constitution guarantees "all people" the right to privacy:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

The U.S. Constitution impliedly also recognizes a fundamental right to privacy. As detailed above, the Program violates Class Members' inalienable right to privacy by eliminating their choice to keep their medical condition private, by requiring public delivery of their medications by someone they do not know and from CSP personnel who may not be sensitive to or have extensive knowledge of their condition.

93.    The California Unruh Civil Rights Act provides that, "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, *disability*, *medical condition*, genetic information, marital status, or *sexual orientation* are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Cal. Civ. Code § 51(b), emphasis added.)

94.    Under the Unruh Act, "'Disability' means any mental or physical disability as defined in sections 12926 and 12926.1 of the Government Code." (Cal. Civ. Code § 51(e)(1).) "Physical and mental disabilities include, but are not limited to, chronic or episodic conditions such as *HIV/AIDS*, hepatitis, epilepsy, seizure disorder, diabetes, clinical depression, bipolar disorder, multiple sclerosis, and heart disease." (Cal. Gov. Code § 12926.1(c), emphasis added.)

95.    The Unruh Act prohibits business establishments from "engaging in any form of arbitrary discrimination." (*O'Connor v. Village Green Owners Assn.*, 33 Cal.3d 790, 794 (1983).) The Unruh Act addresses concerns "not only with access to business establishments, but with *equal treatment of patrons in all aspects of the business.*" (*Koire v. Metro Car Wash.* 40 Cal.3d 24, 29 (1985), emphasis added.) That Act is given a liberal construction with a view to

CLASS ACTION COMPLAINT

1    effectuating its purposes.

2        96.    The Program violates the Unruh Act, as the Program targets individuals with

3    specific disease states. Here, Defendants specifically target certain "specialty medicines" that are

4    used to treat serious and chronic health conditions. In fact, due to the specialized nature of these

5    targeted medications, this policy change predominantly impacts subscribers with serious medical

6    conditions, and specifically for purposes of this Complaint, persons with HIV/AIDS.

7    Furthermore, the Unruh Act requires "equal accommodations, advantages, facilities, privileges,

8    or services in all business establishments of every kind whatsoever" for all persons regardless of

9    "disability [or] medical condition." The Program denies equal use of and access to community

10    pharmacists and denies prescription drug benefits due for only these people.

11        97.    The California Legislature has declared that the State of California has an interest

12    in ensuring that all people have ready and reasonably available access to HIV/AIDS

13    Medications:

14        (a)    State-of-art knowledge regarding treatment of people infected with

15    the human immunodeficiency virus (HIV) indicates that active HIV infection

16    (AIDS) can be a manageable, though chronic, condition with the use of drugs

17    such as zidovudine (AZT), aerosolized pentamidine, and ganciclovir. AIDS

18    experts across the nation agree that early intervention with these drugs can

19    prolong life, minimize the related occurrences of more serious illnesses, reduce

20    more costly treatments, and maximize the HIV-infected person's vitality and

21    productivity.

22        (b)    For reasons of compassion and cost effectiveness, *the State of*

23    *California has a compelling interest in ensuring that its citizens infected with the*

24    *HIV virus have access to these drugs.*

25    (California Health & Safety Code § 120950, emphasis added.)

26        98.    Defendants' conduct also violates various provisions of ERISA. Defendants have

27    failed to appropriately distribute benefits to plan subscribers pursuant to the terms of their

28    ERISA plan, in violation of 29 U.S.C. section 1132(a)(1)(B).

33

CLASS ACTION COMPLAINT

99.    Under the relevant provisions of ERISA, benefits to plan subscribers must be distributed pursuant to the terms of their ERISA plan and not work a reduction or elimination of benefits in the provision of those benefits. (29 U.S.C. § 1132(a)(1)(B).) ERISA further requires that fiduciaries not put their own interests above their beneficiaries. (29 U.S.C. § 1132(a)(2).) In fulfilling fiduciary duties, an ERISA fiduciary must act with undivided loyalty and prudence in managing and administering the plans. (29 U.S.C. § 1104.) In addition, ERISA mandates that benefit plans provide full and fair review of denied claims for patient grievances as required by 29 U.S.C. section 1133, and provide a reasonable claims procedure.

100.    Defendants have breached their fiduciary duties under ERISA by failing to act with undivided loyalty and prudence in managing and administering these health benefit plans in violation of 29 U.S.C. section 1132(a)(2). In controlling and administering the plans, Defendants owe a duty to act solely for the benefit of Plaintiffs, their plan members and/or the Class, as applicable. However, Defendants have put their own interests above their subscribers through their conduct of discrimination and self-dealing by mandating the use of CSP and not providing an opt-out right or notice thereof, incentivizing employers to preclude the choice of any pharmacy to fulfill these specialty medications, refusing to consistently accept manufacturer rebates or discounts, forcing consumers to accept the financial responsibility of lost or stolen shipments, and/or keeping fees or rebates that would be paid to community specialty pharmacies or consumers, all the time profiting as a result thereof. Defendants have also put their own interests before subscribers' interests by seeking to increase their own profits at the expense of their subscribers' health, as set forth above.

101.    In addition, Defendants have failed to provide full and fair review, as required by 29 U.S.C. section 1133. Defendants have failed to provide a reasonable procedure for subscribers who wish to opt-out of the Program and any information regarding appeal of any determinations to deny opt-out requests.

102.    Forcing affected enrollees to participate in the Program will cause severe detriment and irreparable harm to Class Members, as well as the potential for financial loss, as actually suffered by Plaintiffs. Such conduct is continuing. Class Members either have switched

34

against their will to the Program or are being threatened with the requirement to purchase their specialty drugs through CSP in accordance with the Program. Defendants must either agree not to continue to implement the Program in its current form or, at a minimum, provide Class Members the right to opt-out of the Program.

## **CLASS ALLEGATIONS**

103.    This action is brought by Plaintiffs on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure Rule 23. Plaintiffs seek to represent the following class (the "Class"):

> All persons currently or previously enrolled in or covered by a health plan since January 1, 2015 in which the prescription drug benefit is or was administered by CVS Caremark, and who: (i) obtained or may obtain HIV/AIDS Medications; and (ii) have been or may in the future be required to participate in the Program with no right to opt-out or notice thereof, but not including individual claims for personal injury or bodily harm.

104.    The precise number and identity of Class Members are unknown to Plaintiffs but can be obtained from Defendants' records. Based on CVS Caremark's presence nationwide, the Class numbers in thousands of persons.

105.    Common questions of law and fact predominate over any questions affecting individual members of the Class. Such common legal and factual questions include the following:

(a)    Whether Defendants' implementation of the Program as described above violates the numerous federal and state laws and regulations detailed throughout this Complaint;

(b)    Whether Defendants engaged in an unlawful, unfair, misleading or deceptive business act or practice in connection with the implementation of and statements relating to the Program;

(c)    Whether Plaintiffs and Class Members are entitled to damages, equitable monetary relief, disgorgement of profits and/or restitution;

(d)    Whether Plaintiffs and Class Members are entitled to a declaration

CLASS ACTION COMPLAINT

regarding their rights with regard to their health plans' prescription drug benefits; and

(e)     Whether Plaintiffs and Class Members are entitled to an Order enjoining Defendants from engaging in the conduct here at issue.

106.    For the reasons set forth above, Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs have been subjected to the practices at issue. Additionally, as set forth above, Plaintiffs have already expended personal resources or incurred out-of-pocket expenses as a result of the acts and practices of Defendants in connection with the implementation and operation of the Program.

107.    Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity. Based on the facts detailed above, the interests of Plaintiffs are reasonably co-extensive with and not antagonistic to those of absent Class Members. Plaintiffs will fairly and adequately represent and protect the interests of the Class and have no interests adverse to or which materially and irreconcilably conflict with the interests of the other members of the Class.

108.    Plaintiffs have engaged the services of counsel who are experienced in complex class litigation and the issues raised in this Complaint who will vigorously prosecute this action, and will assert and protect the rights of and otherwise adequately represent Plaintiffs and absent Class Members.

109.    To the extent applicable to certification of a class under these circumstances, a class action is superior to other available means for the fair and efficient group-wide adjudication of this controversy. To Plaintiffs' knowledge, no other litigation is pending addressing the issues raised here as against Defendants. The injuries suffered by individual Class Members are, while important to them, relatively small compared to the burden and expense of individual prosecution of the complex issues and extensive litigation needed to address Defendants' conduct.

110.    Individualized litigation presents a potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single

36

adjudication, economies of scale, and comprehensive supervision by a single court.

111. Defendants have acted or refused to act on grounds generally applicable to the Class with regard to implementation and terms of the Program, thereby making appropriate provisional and final declaratory and injunctive relief with respect to Class Members as a whole.

## FIRST CAUSE OF ACTION

### Claim for Violation of Anti-Discrimination Provisions of Affordable Care Act (42 U.S.C. § 18116)

112. Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein. This claim is brought against the CVS Caremark Defendants.

113. Class Members who are enrolled in any health care plan subject to the Program, any part of which received Federal financial assistance, are subject to this Count.

114. Section 1557 of the ACA prohibits discrimination in "any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." (42 U.S.C. § 18116.) Section 1557 states that an individual shall not, on grounds prohibited under, *inter alia*, section 504 of the Rehabilitation Act of 1973 (29 U.S.C § 794) be *excluded from participation in*, be *denied the benefits of*, or be *subjected to discrimination* under any" health program or activity. (42 U.S.C. § 18116, emphasis added.)

115. CVS Caremark's Program is a "health program or activity … receiv[ing] Federal financial assistance" subject to the requirements of 42 U.S.C. section 18116.

116. In addition, CVS Pharmacy, Inc. represents that it is subject to section 1557 of the ACA, and under that law:

> [C]omplies with applicable Federal Civil rights laws and does not discriminate on the basis of race, color, national origin, age, *disability*, or sex. CVS Pharmacy, Inc. does not exclude people or treat them differently because of race, color, national origin, age, *disability* or sex.

(*See* https://www.cvs.com/bizcontent/general/CVS_Pharmacy_Nondiscrimination_Policy.pdf, emphasis added.)

117. HIV/AIDS has been deemed a "disability" under both federal and state laws. Solely on the basis of their disability, Class Members have been excluded from participation in,

CLASS ACTION COMPLAINT

have been denied the full benefits of, or are being subjected to discrimination by being required to participate in the Program and subject to the limitations and discriminatory conduct set forth above, including but not limited to being required to obtain non-specialty medications they could otherwise obtain at the pharmacist of their choice; being forced to use separate but unequal methods to obtain life-sustaining medications and inadequate facilities to do so; being forced to pay more for such medications due to the refusal of CVS to recognize manufacturer discounts and rebates for such medications; being forced to be financially responsible for lost or stolen shipments, which is only an issue due to forced participation in the Program; and/or having their privacy violated and social stigma exacerbated. Class Members have not been provided meaningful access to their life-sustaining medications. Participation in the Program threatens their health and privacy.

118.    As described in more detail herein, CVS Caremark's actions of requiring subscribers to choose between risking their health and privacy by enrolling in the Program, or requiring patients to pay full price for their medications at a community pharmacy where they may receive the consultations they need and that protect their privacy: (i) tend to exclude HIV/AIDS patients from full participation in health care plans where the prescription benefit is administered by CVS Caremark; (ii) denies HIV/AIDS patients the full benefits of their health care plans' drug benefit; and (iii) subjects patients with HIV/AIDS to unjust discrimination based solely on the nature of their health condition, all in violation of the ACA and in contradiction to Defendants' representation that they comply with the ACA.

119.    Defendants' actions have denied Plaintiffs and Class Members full and/or equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations available under their health care plans' prescription drug benefit. The Program:

(a)    <u>Excludes</u> HIV and AIDS patients from coverage. CVS Caremark has or is continuing to threaten to avoid providing patients appropriate coverage based on their health status or medical condition requiring treatment with HIV/AIDS Medications, leaving them to either bear the costs of insurance co-pays, treatment disruption, and loss of privacy, or pay thousands of dollars out-of-pocket each month to purchase such medications at their in-network

38

CLASS ACTION COMPLAINT

community pharmacy of choice. By requiring such patients to access their life-sustaining medications through the Program that threatens their health and privacy, the Program operates as a constructive eviction from coverage and erodes Plaintiffs' on-going ability to receive medications from the pharmacist of their choice and with no right to opt-out of the Program or clear notice thereof. Therefore, enrollees with HIV/AIDS are impermissibly discouraged from enrolling in CVS Caremark health care plans.

(b)    Denies these patients the full benefit of their health care plans' drug benefit. Patients who are forced into the Program bear additional costs in time spent navigating websites or phone menus and long hold times, coordinating with multiple pharmacies and pharmacists for specialty and non-specialty drugs, and experiencing disruptions in their treatment, even in situations where prompt access to this medication is medically necessary. These patients also suffer from the loss of privacy because their medications are either shipped to their workplace or home, where they receive regular, conspicuous deliveries, or drop shipped to a CVS pharmacy, which raises additional privacy problems as set forth above. Defendants' changes to Class Members' health plans' drug benefit put Class Members' health and privacy at risk and reduces or effectively eliminates their drug benefit by requiring subscribers prescribed HIV/AIDS Medications to obtain those medications solely under the Program, particularly without the option to opt-out or receiving clear (or any) notice of the ability to do so. This reduction or elimination of the drug benefit is effectuated by way of the CVS Caremark Defendants' control over enrollees drug benefits and what drugs must use CSP and the Program, control over whether community pharmacies are designated as "out-of-network," control over cost-sharing issues and control over CVS pharmacies that allow Defendants to establish CVS pharmacies as drop shipment locations and limit or effectively bar in-person consultations, advice, and monitoring by pharmacists knowledgeable about HIV/AIDS Medications.

(c)    Discriminates against these patients. Programs that do not provide meaningful access to coverage for patients with HIV/AIDS from pharmacists of their choice are prohibited as discriminatory. The need for this prohibition is clear. Allowing providers to provide ineffective benefits for patients with a pre-existing condition through inconvenient and

CLASS ACTION COMPLAINT

ineffective requirements such as are part of the Program that put the patients' health and privacy at risk undermines one of the central tenets of the ACA: guaranteeing access to care for those with pre-existing conditions. CVS Caremark's requirement that such patients receive their HIV/AIDS Medications under the Program rather than the in-network community pharmacy and specialty pharmacist of their choice, is a coverage rule based on the patients' health status and/or medical condition.

120. Plaintiffs fall within the zone of protected persons under the ACA and thus have standing to seek all appropriate relief available from Defendants under this statute.

121. Plaintiffs request equitable and monetary relief to the fullest extent permissible under the ACA, attorneys' fees, costs, and such other and further appropriate relief against the CVS Caremark Defendants as may be available under this claim.

## SECOND CAUSE OF ACTION

### Violation of Americans with Disabilities Act
### (42 U.S.C. § 12101, *et seq.*)

122. Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein. This claim is brought against the CVS Caremark Defendants.

123. The Americans with Disabilities Act, 42 U.S.C. section 12182, subdivision (a), provides:

> No individual shall be discriminated against on the basis of *disability* in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or *operates a place of public accommodation*.

(Emphasis added.)

124. By implementing the Program, which has or will materially reduce or effectively eliminate their prescription drug benefit by requiring those subscribers subject to the Program and who are prescribed HIV/AIDS Medications to obtain those medications solely under the Program without an option to opt-out or clear notice thereof, and effectively terminate community pharmacies and pharmacists from Plaintiffs' and Class Members' network of

services, the CVS Caremark Defendants have specifically targeted individuals on the basis of a particular disability and affirmatively discriminated against such persons on the basis of their disability.

125.    As the Program only applies to Class Members who are prescribed certain specialty medications, the Program is directed at seriously ill enrollees with "disabilities" protected by the ADA.

126.    Under the ADA, the term "disability" means, with respect to an individual: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or, (C) being regarded as having such an impairment (as described in paragraph (3))." (42 U.S.C. § 12102(1)(A)-(C).) "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." (42 U.S.C. § 12102(2)(A).) A "major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." (42 U.S.C. § 12102(2)(B).)

127.    The U.S. Supreme Court has recognized HIV/AIDS as a "disability" subject to the ADA. (*Bragdon v. Abbott*, 524 U.S. 624, 655 (1998).)

128.    A pharmacy is a "place of public accommodation" recognized by the ADA. (42 U.S.C. § 12181(7)(F).)

129.    Courts have found that a defendant "operates a place of public accommodation" if that defendant exerts "control" over a place of public accommodation; for example, as a result of a financial or contractual relationship between the defendant and the place of public accommodation.

130.    The CVS Caremark Defendants' discriminatory actions have denied or will deny Plaintiffs and members of the Class full and equal enjoyment of the benefits, services, facilities, privileges, advantages, and accommodations available in terms of being able to access the

CLASS ACTION COMPLAINT

pharmacy or pharmacist of their choice. The CVS Caremark Defendants' discriminatory actions requiring those subscribers subject to the Program and prescribed HIV/AIDS Medications to obtain those medications solely under the Program's limitations, and without an option to opt-out or clear notice of that option, effectively bars in-person consultations, advice, and monitoring by pharmacists knowledgeable about HIV/AIDS Medications and Class Members' conditions. It also violates Class Members' right to privacy and/or costs them more money in the form of unrecognized or unapplied rebates or discounts. The CVS Caremark Defendants also control Class Members' access to community pharmacies and pharmacists of their choice by deciding that filling their HIV/AIDS Medication prescriptions there would be "out-of-network" under the terms of the Program.

131.    This reduction or effective elimination of the prescription drug benefit is also effectuated by way of CVS Caremark Defendants' direct control over their subsidiary CVS pharmacies that allow CVS Caremark Defendants to establish CVS pharmacies only as drop shipment locations or specialty pharmacies and effectively bar in-person consultations, advice, and monitoring by pharmacists knowledgeable about HIV/AIDS Medications.

132.    Furthermore, CVS Caremark Defendants' financial arrangements with their subsidiaries and controlling the payments they make to the specialty community pharmacies, and CVS Caremark Defendants' contractual relationships with those pharmacies—specifically, changes to the "in-network" status of those pharmacies as to the specialty medications in question by making these pharmacies "out-of-network" for purposes of those medications—effectively bar Class Members' access to community pharmacies that have provided HIV/AIDS Medications for years. These financial arrangements and contractual changes have made, or will make, HIV/AIDS Medications unaffordable and therefore unavailable at those pharmacies where specialty community pharmacists provide life-saving advice and counseling that Plaintiffs and Class Members have come to rely on. Therefore, Plaintiffs and Class Members are subject to discriminatory treatment based on their disability that threatens their health and their privacy.

133.    In using their direct and on-going control over their subsidiary CVS pharmacies, as well as financial incentives and contractual control over plans and community pharmacies to

CLASS ACTION COMPLAINT

discriminatorily deny Plaintiffs and Class Members' access to life-saving counseling and appropriate access to life-sustaining medications, the CVS Caremark Defendants have created a nexus between the prescription drug benefit, the HIV/AIDS Medications at issue, and access to life-sustaining services provided at community pharmacies. Therefore, there is a nexus and connection between a place of public accommodation and the disparity in benefits, services, facilities, privileges, advantages, and accommodations that the CVS Caremark Defendants make available to Class Members, compared to other enrollees who are not currently prescribed these specific specialty medications or are not otherwise subject to the Program.

134. Due to the CVS Caremark Defendants' significant direct and indirect control over their subsidiary CVS pharmacies and Class Members' access to their preferred community pharmacies, exercised through contractual agreements and financial arrangements and by making these specialty medications an "out-of-network" event at non-CVS community pharmacies, the CVS Caremark Defendants effectively deny access to a place of public accommodation to Class Members for their life-sustaining medications.

135. Plaintiffs proceeding under the "nexus" theory need not plead denial of physical access to a place of public accommodation. Intangible barriers equally restrict a disabled person's ability to enjoy goods, services and privileges. These intangible barriers include effectively limiting and/or denying Class Members' access to community pharmacies providing in-person consultations, advice, and monitoring by pharmacists knowledgeable about HIV/AIDS Medications in a setting that protects their right to privacy and/or not providing clear notice of their ability to opt-out of the Program. The intangible barriers erected by the CVS Caremark Defendants—which also effectively deny Class Members' access to non-CVS specialty pharmacies and pharmacists—is further implemented through CVS Caremark's contractual control over access to those non-CVS pharmacies and pharmacists, which results in those places of public accommodation being "out-of-network" for purposes of HIV/AIDS Medications.

136. Under 42 U.S.C. section 12188 of the ADA, any person who is subjected to discrimination on the basis of disability, or who has reasonable grounds for believing that such person is about to be subjected to discrimination, may seek appropriate remedies.

43

137.    Plaintiffs and Class Members have and will continue to be harmed by Defendants' actions through the loss of access to community pharmacies and pharmacists of their choice.

138.    The CVS Caremark Defendants' conduct either has or will continue to cause harm to Plaintiffs and all other Class Members, and is a substantial factor in causing such harm.

139.    Plaintiffs seek an order enjoining the CVS Caremark Defendants from continuing to engage in such conduct.

140.    As a proximate result of the CVS Caremark Defendants' conduct, Plaintiffs were forced to seek legal representation. Plaintiffs also seek appropriate monetary relief to the extent available, attorneys' fees and costs, and all other additional appropriate relief as may be available under this cause of action.

## **THIRD CAUSE OF ACTION**

### **Violation of Unruh Civil Rights Act**
### **(Cal. Civ. Code § 51, *et seq.*)**

141.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein (except paragraphs 98-101 or the other incorporation references that include those paragraphs). This claim is brought on behalf of members of the Class who reside in California or received their prescriptions under the Program from shipments originating in California. This claim is brought against the CVS Caremark Defendants.

142.    The Unruh Civil Rights Act, California Civil Code section 51(b), provides: All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

143.    For all the reasons set forth above, the CVS Caremark Defendants' actions have denied Plaintiffs and members of the Class full and equal benefits under their health care plans' prescription drug benefit as compared to persons not prescribed HIV/AIDS Medications.

44

Defendants also discriminated or made a distinction that denied Plaintiffs and Class Members full benefits under their health care plans' prescription drug benefit.

144.    Defendants' actions constitute discrimination on the basis of medical condition and disability as set forth herein.

145.    Defendants' Program results in arbitrary discrimination. While Defendants may assert that requiring patients to fill prescriptions for certain expensive drugs under the Program is factually and rationally related to providing cost effective healthcare, in fact an increased risk of detrimental health and loss of personal privacy associated with such limited services may actually increase costs and personal hardship over time.

146.    Furthermore, community standards in California and elsewhere do not comport with companies subjecting enrollees with or subject to contracting HIV/AIDS to different and riskier means of obtaining life-sustaining medications, and thus does not implicate a compelling societal interest.

147.    The Program also reinforces harmful stereotypes by excluding Class Members from the normal societal means of acquiring prescription medications, including requiring them to utilize "separate and unequal" means to fill their prescriptions, as compared to consumers only receiving non-specialty medications.

148.    Such arbitrary discrimination has the effect of undermining Class Members' health care plans' prescription drug benefit and terminating their continued community pharmacy access, and will deny them equal and full use and access of these community pharmacy facilities and pharmacists.

149.    By implementing the Program, which greatly reduces Class Members' health plan drug benefits and effectively terminates the specialty community pharmacists from Plaintiffs' and Class Members' network of service for their specialty medications, the CVS Caremark Defendants have targeted individuals that have a particular chronic disease and affirmatively made a distinction or discrimination against such persons on the basis of their specific chronic disease. Such conduct is prohibited by the Unruh Civil Rights Act, California Civil Code section 51, *et seq.*

45

150.    Plaintiffs' medical conditions and the need to procure expensive specialty medications to treat that chronic condition was a motivating reason for the CVS Caremark Defendants' conduct in requiring or threatening to require them to access such medications solely through the Program.

151.    Plaintiffs and Class Members have been and will continue to be harmed by the CVS Caremark Defendants' actions: (i) as a result of the time they have expended in attempting to navigate the bureaucratic requirements of the Program and unsuccessful attempts to opt-out of the Program; (ii) the loss of access to their community pharmacy, community pharmacist and personal consultations; (iii) interruptions in their continuity of care; and (iv) losses and expenditures of resources as set forth above.

152.    The CVS Caremark Defendants' conduct has or will cause harm to Plaintiffs and Class Members, and is a substantial factor in causing such harm.

153.    To the extent such violations of the Unruh Civil Rights Act are based on and arise out of the legal duties imposed on the CVS Caremark Defendants under federal law, including the anti-discrimination provisions of the ADA and ACA as set forth above, that are independent of any duties arising under ERISA, this cause of action is properly asserted on behalf of all Class Members who reside in California.

154.    As a proximate result of the CVS Caremark Defendants' conduct, Plaintiffs and Class Members are entitled to recover actual, compensatory and statutory damages in an amount to be proven at trial, as well as attorneys' fees and costs, as permitted under the Unruh Civil Rights Act and to the extent permitted by law.

## **FOURTH CAUSE OF ACTION**

### **Violation of California Business & Professions Code Section 17200, *et seq.***

155.    Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein (except paragraphs 98-101 or the other incorporation references that include those paragraphs). This claim is brought on behalf of members of the Class who reside in California or received shipments under the Program in California. This claim is brought against

46

the CVS Caremark Defendants.

156.    California Business & Professions Code section 17200, *et seq.*, prohibits acts of "unfair competition," which is defined by California Business & Professions Code section 17200 as including "any unlawful, unfair or fraudulent business act or practice."

157.    The acts and practices as described above violate California Business & Professions Code section 17200's prohibition against engaging in "unlawful" business acts or practices, by, *inter alia*, violating the above-stated provisions of federal and state law including the ACA, ADA, 45 C.F.R. 156.122(e), the Unruh Act, and the other laws and regulations as set forth in detail above (except the provisions of federal law relating to ERISA). To the extent such claims apply the same standards as the above cited federal laws, these claims are properly asserted by all Class Members who can assert such claims.

158.    The CVS Caremark Defendants' conduct does not benefit consumers or competition. Indeed, the harm to consumers and competition is substantial for the reasons set forth above.

159.    Plaintiffs and Class Members could not have reasonably avoided the injury each of them suffered based on implementation of the Program, which injury is substantial, even though Plaintiffs have attempted to do so.

160.    The gravity of the consequences of the CVS Caremark Defendants' conduct as described above outweighs any justification, motive or reason therefor, and is immoral, unethical, and unscrupulous, offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, or is substantially injurious to Plaintiffs and other members of the Class.

161.    To the extent Class Members have a right to opt-out of the Program but have not been adequately informed of that right and/or been told it does not exist when under the law it must, the CVS Caremark Defendants' conduct of not advising them of this right would have a tendency or likelihood to mislead consumers to reasonably believe such an option does not exist when in reality it does.

162.    Plaintiffs have been injured in fact and suffered a loss of money or property as a

47

result of the CVS Caremark Defendants' unlawful business acts and practices by, *inter alia*, (i) spending hours dealing with these issues; (ii) having benefits in which they have or had a vested interest materially reduced or eliminated; (iii) either already paying or being told they will need to pay increased amounts for such specialty medications, even if covered, if they continue to obtain such medications from the community pharmacy of their choice; and (iv) even if they obtain these medications through the Program, their loss of discounts, rebates, loyalty programs or other monies or programs that if accepted by the CVS Caremark Defendants would otherwise reduce their out-of-pocket costs.

163.    As a result of Defendants' violations of the UCL, Plaintiffs and Class Members are, to the extent permitted by law and that such relief does not conflict with the other causes of action set forth herein, entitled to equitable relief in the form of full restitution and disgorgement of the unjust enrichment Defendants derived from these illegal business acts and practices.

164.    Plaintiffs also seek an order enjoining Defendants from continuing these illegal business practices and from engaging in such conduct, and payment of attorneys' fees and costs pursuant to, *inter alia*, California Civil Code. section 1021.5.

## FIFTH CAUSE OF ACTION

### Claim for Benefits Due Under the Plans Governed by ERISA
### (29 U.S.C. § 1132(a)(1)(B))

165.    Plaintiffs incorporate by reference paragraphs 1-111 as though fully set forth herein.

166.    Class Members who are or were enrolled in any health care plan that is an employee welfare benefit plan within the meaning of 29 U.S.C. section 1002(1)(A) where the prescription drug benefit is administered by CVS Caremark, and that is otherwise subject to any provision of Title I of the Employee Retirement Income Security Act of 1974, 29 U.S.C. section 1001, *et seq.*, are subject to this Count.

167.    Defendants violated their legal obligations under ERISA when they engaged in the conduct described in this Complaint. These violations include CVS Caremark's implementation of a mandatory program targeting HIV and AIDS patients, denial of the right to

48

CLASS ACTION COMPLAINT

opt-out of the Program or provide clear notice of that right, the revocation of their valuable benefit and right to use non-CVS pharmacies on an in-network basis, and the denial of financial discounts or rebates or shifting the financial responsibility of lost or stolen shipments to them, offering and/or entering into agreements with CVS that did not provide an ability to opt-out of the Program, at least according to CVS Caremark, all causing a reduction in or elimination of benefits without a change in actual coverage, as well as the failure to provide clear notice thereof.

168. CVS Caremark's unlawful change of coverage based apparently on internal guidelines and policies requiring Class Members to switch from using a community pharmacy to the Program for obtaining their specialty medications, and the designation of the community pharmacy as now being "out-of-network," caused a reduction in or elimination of Plaintiffs' and Class Members' benefits. Defendants' changes to Class Members' health plans' prescription drug benefit puts Class Members' health and privacy at risk and reduce or effectively eliminate their drug benefit by requiring Class Members to obtain those medications solely under the Program without an option to opt-out of the Program, or clear notice thereof. This reduction or elimination of the drug benefit is effectuated by way of, *inter alia,* Defendants' control over which CVS pharmacies allow Class Members to fill their prescriptions directly, and which CVS pharmacies act only as drop shipment locations and thus effectively bar in-person consultations, advice, and monitoring by pharmacists knowledgeable about HIV/AIDS Medications.

169. CVS Caremark caused a reduction in or elimination of Plaintiffs' and Class Members' benefits by exclusively requiring their use of CSP to acquire these specialty medications, resulting in the violation of the laws and regulations set forth in this Complaint. Accordingly, CVS Caremark's requirement that Plaintiffs and the Class use only CVS Caremark's subsidiary—CSP—without the right to opt-out of the Program, or provide clear notice thereof, violates the laws set forth in this Complaint and unlawfully reduces or eliminates their benefits in a manner that is inconsistent with their stated coverage.

170. On March 30, 2016, JOHN DOE ONE submitted a formal appeal to both his employer and CVS Caremark, and later a second level appeal, requesting to opt-out of the

CLASS ACTION COMPLAINT

Program. JOHN DOE TWO submitted appeals to his husband's former employer and CVS Caremark requesting to opt-out of the Program on numerous occasions (January 11, 2016, February 28, 2016, April 1, 2016, and May 11, 2016). On March 24, 2016, JOHN DOE THREE submitted an appeal to both his employer and CVS Caremark requesting to opt-out of the Program, for both himself and his spouse JOHN DOE FOUR. All Plaintiffs followed the appeal and grievance requirements provided for in their plan documents, and all were denied. None of the Plaintiffs have been allowed to opt-out of the Program or received notice of any right to do so.

171.    All further appeals regarding the Program for Class Members are futile because CVS Caremark has implemented the Program across-the-board and has consistently denied requests to opt-out of the Program or failed to provide clear notice of their right to do so, as applicable.

172.    Plaintiffs seek the benefit of continued access to community pharmacies as an "in-network" benefit due under their employee welfare benefit plans and to enjoin the continued implementation of the Program in its current form.

173.    In addition, Plaintiffs request appropriate injunctive relief, equitable estoppel, and equitable monetary relief to prevent Defendants' unjust enrichment to the extent permitted under 42 U.S.C. section 1132(a)(3), attorneys' fees, costs, and such other and further appropriate relief against CVS as may be available under this claim.

### SIXTH CAUSE OF ACTION

**Claim for Breach of Fiduciary Duties Under ERISA**
**(29 U.S.C. § 1132(a)(3))**

174.    Plaintiffs incorporate by reference each of the paragraphs 1-111 as though fully set forth herein.

175.    Class Members who are or were enrolled in any health care plan that is an employee welfare benefit plan within the meaning of 29 U.S.C. section 1002(1)(A) where the prescription drug benefit is administered by CVS Caremark and that is otherwise subject to any provision of Title I of the Employee Retirement Income Security Act of 1974, 29 U.S.C. section

50

1001, *et seq.* are subject to this Count.

176.    CVS Caremark serves as a fiduciary under 29 U.S.C. section 1002(21)(A) for numerous plans covered by ERISA providing benefits to members of the Class because CVS Caremark exercises significant if not sole discretionary authority with respect to the management of the prescription drug benefit of these plans. CVS Caremark: (i) is given the discretion to interpret benefits, terms, conditions, limitations, and make factual determinations related to the plan's prescription drug benefits, which typically includes deciding whether a particular specialty medication is to be subject to the Program or not; (ii) provides financial inducements to plan sponsors incentivizing use of the Program; (iii) requires that mail order shipments be solely fulfilled by its own subsidiary CSP; (iv) decides whether or not to consistently accept discounts and rebates, and whether to shift the financial responsibility of lost or stolen shipments to Plaintiffs and Class Members; and (iv) establishes its pharmacies as drop shipment locations. How such medications are delivered and where, the limited options provided to Plaintiffs and Class Members to obtain their medications, the mix ups and delays occasioned by CVS's flawed delivery process, the decision not to consistently accept rebates or discounts, the decision to use CVS pharmacies only as drop shipment locations as compared to providing full services and consultation to such enrollees, and the decision to offer an opt-out and non-opt-out option to enrollees without financial incentive are all matters within CVS's discretion and control. As such, CVS Caremark owed the plans' participants and beneficiaries a duty to act with undivided loyalty and prudence in managing and administering the prescription drug aspect of their health plans. AMTRAK is a self-funded plan sponsor and thus also act as a fiduciary to its enrollees that are members of the Class as defined above.

177.    Defendants breached their duties of loyalty and prudence under ERISA by engaging in the conduct described in this Complaint, specifically through their conduct of discrimination and self-dealing. Among other things, Defendants breached their duty of loyalty and prudence by failing to act in accordance with the ACA and the ADA, by implementing or proposing to continue to implement a Program that does not satisfy minimum standards of care, by engaging in financial self-dealing, and by not permitting enrollees to opt-out of the Program

51

CLASS ACTION COMPLAINT

1    and/or giving them no or insufficient notice of their right to do so.

2        178.    By requiring Plaintiffs and the Class to use the Program and only CSP in order to

3    obtain their pharmacy benefits, CVS Caremark is not acting solely in the interest of participants

4    and beneficiaries, causing a significant decrease or elimination in their prescription drug

5    benefits. CVS Caremark has decreased or eliminated plan benefits in order to increase their own

6    profits by requiring enrollees to only use CSP, CVS Caremark's wholly-owned subsidiary, to

7    access their life-saving HIV/AIDS Medications and/or not providing clear notice of their ability

8    to opt-out of the Program.

9        179.    CVS Caremark has put its own interests before the Class Members by inducing

10   plan sponsors to enroll Class Members in prescription drug benefit plans subject to the Program.

11       180.    CVS Caremark has further breached its duties by failing to meet the requisite

12   standard of prudence under 29 U.S.C. section 1104, which requires CVS Caremark to discharge

13   their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing

14   that a prudent man acting in a like capacity and familiar with such matters would use in the

15   conduct of an enterprise of a like character and with like aims." CVS Caremark is not new to the

16   health insurance industry and thus is acutely aware of its obligations as a health care entity, yet it

17   has engaged in conduct that risks violation of its participants' and beneficiaries' health and

18   privacy rights, and acted in direct contravention of ERISA's prudent person standard. AMTRAK

19   operates as a self-funded plan sponsor and thus also act as a fiduciary to its enrollees that are

20   members of the Class as defined above.

21       181.    Through these actions, Defendants decreased or eliminated Plaintiffs' and Class

22   Members' plan benefits. As a result of this wrongful conduct, the Class has or will suffer a

23   reduction in the quality and continuity of care they receive, and an overall decrease in or

24   elimination of benefits for the plans they pay for or are provided by their employers.

25       182.    This wrongful conduct has consequently caused Plaintiffs and the Class to suffer

26   injuries, in an amount to be determined at trial.

27       183.    Plaintiffs are permitted to bring a claim for breach of fiduciary duty under 29

28   U.S.C. section 1132(a)(3). Plaintiffs seek, *inter alia*, the benefit of continued access to

52

community pharmacies as an "in-network" benefit under their plans on the same terms as non-specialty medications and to enjoin the continued implementation of the Program.

184.    In addition, Plaintiffs request appropriate injunctive relief, equitable estoppel, and equitable monetary relief to prevent Defendants' unjust enrichment to the extent permitted under 42 U.S.C. section 1132(a)(3), attorneys' fees, costs, and such other and further appropriate relief against Defendants as may be available under this claim.

## SEVENTH CAUSE OF ACTION

### Claim for Failure to Provide Full and Fair Review Required by ERISA
### (29 U.S.C. § 1132(a)(3))

185.    Plaintiffs incorporate by reference each of paragraph 1-111 as though fully set forth herein.

186.    Class Members who are or were enrolled in any health care plan that is an employee welfare benefit plan within the meaning of 29 U.S.C. section 1002(1)(A) where the prescription drug benefit is administered by CVS Caremark and that is otherwise subject to any provision of Title I of the Employee Retirement Income Security Act of 1974, 29 U.S.C. section 1001, *et seq.*, are subject to this Count.

187.    29 U.S.C. section 1133 of ERISA requires that every employee welfare benefit plan "(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant," and "(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

188.    On March 30, 2016, JOHN DOE ONE submitted a formal appeal to both his employer and CVS Caremark, and later a second level appeal, requesting to opt-out of the Program. JOHN DOE TWO submitted appeals to his husband's employer and CVS Caremark requesting to opt-out of the Program on numerous occasions (January 11, 2016, February 28, 2016, April 1, 2016, and May 11, 2016). On March 24, 2016, JOHN DOE THREE submitted an appeal to both his employer and CVS Caremark requesting to opt-out of the Program for himself

and his husband. All Plaintiffs followed the appeal and grievance requirements provided for in their plan documents, and were denied. None of the Plaintiffs have been allowed to opt-out of the Program.

189.    CVS Caremark's across-the-board implementation of the Program and its blanket denial of the right to opt-out of the Program or provide clear notice thereof are evidence of the absence of full and fair review under the Program.

190.    CVS Caremark functions as a fiduciary for numerous plans because CVS Caremark exercises significant if not sole discretionary authority with respect to management of the prescription drug benefit of the plans as alleged above. (29 U.S.C. § 1002(21)(A).). CVS Caremark has also effectively functioned jointly as the "Plan Administrator" within the meaning of such term under ERISA for purposes of the specialty medications here at issue, as CVS Caremark decided: (i) to implement the Program; (ii) whether a particular specialty medication is subject to the Program; (iii) to provide financial inducements to plan sponsors to enroll consumers in prescription drug benefit plans subject to the Program; (iv) whether to provide employers the ability to let enrollees opt-out of the Program; (v) whether to provide clear notice thereof, (vi) to designate CVS pharmacies as merely drop shipment facilities; and (vii) to permit mail order deliveries to be solely fulfilled by its own subsidiary CSP.

191.    Although CVS Caremark was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. section 1133 and the regulations promulgated thereunder by consistently refusing to consider requests to opt-out or in many circumstances denying formal appeals altogether.

192.    CVS Caremark has failed to provide a reasonable procedure for opting-out of the Program and/or failed to provide clear notice and information to Class Members regarding any opt-out right or any appeal of adverse opt-out determinations.

193.    As a result, CVS Caremark failed to provide a "full and fair review," and failed to make necessary disclosures to participants and beneficiaries regarding any opt-out process from the Program or the ability to appeal any adverse determination.

194.    Plaintiffs and Class Members have been harmed by CVS Caremark's failure to

CLASS ACTION COMPLAINT

1  provide a "full and fair review" of appeals under 29 U.S.C. section 1133, and by CVS

2  Caremark's failure to properly disclose relevant information in violation of ERISA.

3      195.    AMTRAK is also a fiduciary for certain Plaintiffs and Class Members subject to

4  its pharmacy benefit program, and as to those persons failed to provide for full and fair review.

5      196.    Plaintiffs are entitled to assert a claim under 29 U.S.C. section 1132(a)(3) for

6  Defendants' failure to comply with the above requirements. Plaintiffs seek the aforementioned

7  benefit of continued access to community pharmacies as an "in-network" benefit due under their

8  employee welfare benefit plans and to enjoin the continued or proposed continued

9  implementation of the Program.

10     197.    In addition, Plaintiffs request appropriate injunctive relief, equitable estoppel, and

11  equitable monetary relief to prevent Defendants' unjust enrichment to the extent permitted under

12  42 U.S.C. section 1132(a)(3), attorneys' fees, costs, and such other and further appropriate relief

13  against CVS as may be available under this claim.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

16     198.    Plaintiffs incorporate by reference the preceding paragraphs as though fully set

17  forth herein.

18     199.    An actual controversy over which this Court has jurisdiction now exists between

19  Plaintiffs, members of the Class and Defendants concerning their respective rights, duties and

20  obligations under the various health care prescription drug benefit agreements as set forth herein.

21     200.    Plaintiffs are entitled to a declaration of rights regarding their rights and

22  obligations under such agreements, including whether: (i) Defendants may continue to

23  implement the Program under its current terms; and (ii) whether Class Members have a right to

24  opt-out of the Program and to receive clear notice of that right. Such declarations may be had

25  before there has been any breach of such obligation in respect to which such declaration is

26  sought. (*See* 28 U.S.C. § 2201, *et seq.*; Cal. Civ. Proc. § 1060(a).)

27     201.    Plaintiffs and Class Members may be without adequate remedy at law, rendering

28  declaratory relief appropriate in that:

CLASS ACTION COMPLAINT

(a)    relief is necessary to inform the parties of their rights and obligations under the agreements referenced herein;

(b)    damages may not adequately compensate Class Members for the injuries suffered, nor may other claims permit such relief;

(c)    the relief sought herein in terms of ceasing such practices may not be fully accomplished by awarding damages; and

(d)    if the conduct complained of is not enjoined, harm will result to Class Members and the general public because Defendants' wrongful conduct is both threatened as to those Class Members who have yet to be fully subjected to the Program and/or is continuing as to those Class Members still subjected to the Program and who desire not to participate in the Program and/or are currently being denied or not adequately informed of any ability to opt-out of the Program.

202.    A judicial declaration is therefore necessary and appropriate at this time and under these circumstances so the parties may ascertain their respective rights and duties.

203.    Plaintiffs request a judicial determination and declaration of the rights of Class Members, and the corresponding responsibilities of Defendants. Plaintiffs also request an order declaring Defendants are obligated to not continue the Program in its current form, must provide Plaintiffs and Class Members the opportunity to opt-out of the Program, and pay over all funds Defendants wrongfully acquired either directly or indirectly as a result of the illegal conduct by which Defendants were unjustly enriched in terms of reimbursements or payment of monies that would not have been paid to or retained by Class Members absent such illegal conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief as follows as applicable for the particular cause of action:

1.    An Order certifying this action to proceed on behalf of the Class, including any appropriate sub-class, and appointing Plaintiffs and the counsel listed below to represent the Class;

2.    An Order awarding Plaintiffs and the Class Members entitled to such relief such

CLASS ACTION COMPLAINT

equitable monetary relief as the Court deems proper;

3.    An Order enjoining Defendants from implementing or continuing the Program in its current form, or such other appropriate injunctive relief;

4.    An Order providing a declaration of rights of the parties as set forth above;

5.    An Order awarding Plaintiffs and the Class Members who might be entitled to such relief actual, compensatory, and/or statutory damages to the extent permitted by the above claims;

6.    An Order awarding Plaintiffs' attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to, *inter alia*, California Civil Code section 1021.5 and the federal and state statutory causes of action set forth above that permit such an award;

7.    An Order awarding pre-judgment and post-judgment interest on the above amounts; and

8.    An Order awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and causes of action so triable.

DATED: February 16, 2018        **WHATLEY KALLAS, LLP**

By:    */s/Alan M. Mansfield*
ALAN M. MANSFIELD (SBN 125998)
(Of Counsel)
amansfield@whatleykallas.com
16870 W. Bernardo Dr., Ste. 400
San Diego, CA 92127
Tel: (858) 674-6641
Fax: (855) 274-1888

1 Sansome Street, 35th Floor, PMB # 131
San Francisco, CA  94104
Tel:  (415) 860-2503
Fax:  (888) 331-9633

**WHATLEY KALLAS, LLP**
Edith M. Kallas (To Apply *Pro Hac Vice*)
ekallas@whatleykallas.com
1180 Avenue of the Americas, 20th Fl.
New York, NY  10036
Tel: (212) 447-7060
Fax: (800) 922-4851

**CONSUMER WATCHDOG**

57

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:    /s/Jerry Flanagan
        JERRY FLANAGAN (SBN 271272)
jerry@consumerwatchdog.org
Benjamin Powell (SBN: 311624)
ben@consumerwatchdog.org
2701 Ocean Park Blvd., Suite 112
Santa Monica, CA 90405
Tel: (310) 392-0522

**Attorneys for Plaintiffs**

CLASS ACTION COMPLAINT